CHICAGO, BURLINGTON & QUINCY RAILROAD
COMPANY v. JAS. M. McCOOEY et al., Appellants.

Division One, December 22, 1917.

1. **CHARTER OF RAILROAD:** Interpretation. The charter of a rail-
road, organized for the purpose of constructing a line of railroad
between a named point in Iowa and a named point in Missouri,
must be construed with reference to the existing conditions to
which it referred, and its words will not be strained to fit an
absurdity. Where the charter said "the railroad is to extend" from
Keokuk, Iowa, to St. Louis, Missouri, "it being intended to pur-
chase the railway" of another company "between Keokuk, Iowa,
and Dardenne, Missouri, and construct and complete the same to
St. Louis, Missouri," it will not be held that the company had
no power to construct a railroad between Keokuk and Dardenne;
the company's charter power to construct a railroad cannot be
confined to the short distance between Dardenne and St. Louis.

2. EMINENT DOMAIN: Power of Legislature and Courts. The power to take the property of the individual for public uses is inherent in the government which creates and protects by law the private right, and resides in the Legislature, and may be exercised through such agencies as it may create, subject only to the restrictions of the Constitution, which limits the legislative discretion by declaring that whether the contemplated use be really public shall be a judicial question.

3. ————: Railroad: Necessity. A chartered railroad, including its construction, maintenance and operation, is a public use, and that being true the question for determination is whether the power of eminent domain conferred upon the company by the statute includes the right to condemn the particular land for the purpose stated in its petition. No fraud being alleged, the necessity for the taking is to be determined by the railroad company, and not by the courts.

4. ————: ————: Map and Profile. The General Statutes of 1865 did not require the filing by a railroad company of a map of its right of way, but only a map of "the route intended to be adopted," and the statute of 1877 by using the word "roadbed" excludes the idea that the map should include the right of way; and the fact that the railroad company has for more than thirty years been operating its trains along a track within a few feet of the land sought to be condemned, and forming a part of a continuous line, demonstrates, without the aid of a profile map then filed, that the road had been located; and the fact that the map was not filed until after the work of construction was begun in the county does not affect the power of eminent domain conferred on the company by the statutes.

5. ————: ————: ————: Joint Use of Connecting Track: Right to Construct After Expiration of Contract. The profile map showed the route intended to be adopted by plaintiff company, and also a gap of three-quarters of a mile near a bridge that was to be connected by the track of another railroad, and showed that plaintiff's track, together with this link supplied by the other road, constituted a continuous line of 165 miles. The statute then and now in force authorized railroads to "contract with each other in any manner not inconsistent with the scope, object and purpose of their creation and management," and the plaintiff contracted with the other company for the joint use of this "gap" track, by which it became available for all purposes for which plaintiff was incorporated, and this joint use continued for thirty years, and now at the point of this gap plaintiff wishes to condemn a narrow strip along the right of way of the other road and thus supply the link in its track. Another statute (Sec. 3212, R. S. 1909) provides that if a railway company "shall not finish its

road and put it in operation in ten years from the filing of its articles of association, its corporate existence and powers shall cease." *Held*, that plaintiff's line at the point of the gap was, within the meaning of the statute, finished and in operation within the ten years allowed by it, and that said profile map was sufficient for the purpose of this condemnation proceeding.

6. ————: ————: Joint Use of Connecting Track: Abandonment and Election: Future Power to Condemn. An arrangement between the plaintiff railroad company and another company by which for thirty years both companies used a small part of the latter's track, which formed a connecting link in plaintiff's track and thereby constituted it a continuous line, was not an abandonment by the plaintiff of its right, after the arrangement ceased, to condemn land at that point and thus supply the link in its track, nor did it elect to stand forever upon the rights acquired by the arrangement, though its profile map filed showed this portion of the other company's track to constitute a link in its track. The statute does not contain any limitation of time for the condemning by a railroad company of land made necessary by any condition relating to construction, protection or improvement, but on the contrary requires it to exercise the right whenever the public service requires it.

Appeal from Hannibal Court of Common Pleas.—*Hon. William T. Ragland*, Judge.

AFFIRMED.

*Nelson & Bigger* for appellants; *F. L. Schofield*, of counsel.

(1) Where private property is sought to be taken against the will of the owner under statutory authority all the statutory requirements must be fully and strictly complied with. Railway v. Davis, 197 Mo. 669; Railroad v. Leewright, 113 Mo. 667; Ells v. Railroad, 51 Mo. 200; St. Louis v. Koch, 169 Mo. 587; Williams v. Kirby, 169 Mo. 622; Railroad v. Young, 96 Mo. 39. And the question of the existence of the power is a jurisdictional one and may be controverted at any stage of the proceedings. Hopkins v. Railroad, 79 Mo. 98; Railroad v. Campbell, 62 Mo. 585. When the power of eminent domain is sought to be exercised by a railroad company, it must act within the time limited to the company in its charter. Railroad v. St. Louis, 66 Mo. 250; Railway v. Railway, 129 Mo. 70.

(2) It is believed that the only legislative authority conferred upon railroad corporations in this State to condemn rights of way for the main line of their roads is to be found in the following section of the statutes: R. S. 1909, sec. 3048, 3049, 3074, 3212. The right of condemnation asserted and pursued by the plaintiff in this case is not conferred or supported by any of the above sections nor, it is believed, by any other statutory authority. (3) The power to condemn here asserted is based upon the plaintiff's succession in ownership and right, as assignee, of the St. Louis, Keokuk & Northwestern Railway Company. But that company never acquired such power in respect of the property of the defendants here involved. (a) The articles of association of that company neither contemplated nor authorized the building of any railroad except an extension of the old Mississippi Valley & Western railroad from the town of Dardenne in St. Charles County to the city of St. Louis. (b) The profile map of that company itself clearly shows that its railroad, built or proposed, did not pass over, run across or even approach these lands of the defendants here involved. Railway v. Davis, 197 Mo. 669. (c) The profile map fails to show any definite width by actual survey "laid out," as required by statute. R. S. 1909, secs. 3048, 3049. (d) But, even if the profile map did show a definite width by actual survey for the right of way, and even if it did show the location of its railroad upon and across the property of the defendants, still, such right of condemnation expired by a failure to finish its railroad and put it into operation within ten years limited to it by the statute. R. S. 1909, sec. 3212. (4) Even if it be conceded that the St. Louis, Keokuk & Northwestern Railway Company had acquired and perfected a full right to enter upon and condemn the property of defendants prior to 1878, in that year said company entered into a contract with the Hannibal Bridge Company whereby it provided and secured for itself both a temporary traffic arrangement and a definite provision for an ultimate permanent right of way of its own across these two city blocks over

ground not owned by these defendants but owned by the Bridge Company. By so doing that Railway Company avoided the necessity and cost of condemning ' and paying for a right of way across said city blocks on defendants' property, and it and its successor, the plaintiff company, having gone into possession of and used the rights acquired by this contract for more than thirty-five years, must now be held to have abandoned whatever right to condemn defendants' property which said company may have had, if it ever had any such right. Railway v. Davis, 197 Mo. 676; Investment Co. v. Railroad, 108 Mo. 50. Furthermore the St. Louis, Keokuk and Northwestern Railway Company by so providing itself with a right of condemnation across these two blocks on the right of way ground of the Bridge Company, elected to be satisfied with such narrow right of way so acquired. Neither that company nor its successor, the plaintiff company, after standing on this election for a period of thirty-five years, can now repudiate it. Railway v. Railroad, 135 Mo. 557. (5) The "right to condemn more land" for a right of way, necessarily implies the existence of some present right of way which is to be widened to meet the need. In the case at bar the effort is not to widen a narrow right of way already existing, and owned by the condemning company; but the effort is to acquire an entirely new right of way where no right of way existed before. No statutory authority can be found to authorize such a proceeding. (6) If the right to condemn "more right of way" across these two city blocks exists anywhere, it abides only in the Bridge Company whose present right of way borders on defendants' land, and not in the plaintiff company which possesses no right of way whatever immediately adjacent to defendants' lands. In such a case, insofar as relates to the main line of road, "the right of way is restricted to what was originally claimed;" "and whatever lien upon or right to the land it may have secured by locating its road and filing its map, will be confined to the quantity it elected to take." Railway v. Railroad, 135 Mo. 557.

*Chester M. Dawes, O. M. Spencer* and *Mahan, Smith & Mahan* for respondent.

(1) Plaintiff has full power to condemn the property and the action of the trial judge in entering a judgment of condemnation was right. Secs. 3039, 3049, 3074, 3078, 2360, 2368, R. S. 1909; Bridge Co. v. Stone, 174 Mo. 49; State ex rel. v. Cook, 171 Mo. 360; Railway v. Lewright, 113 Mo. 660; Gray v. Railroad, 81 Mo. 126. (2) Having acquired a right of way and used the Bridge Company tracks as a part thereof, plaintiff can lawfully condemn the adjoining property within its one-hundred-foot-wide right of way. Lewis on Eminent Domain (3 Ed.), secs. 403, 221; In re Railroad, 21 Atl. 969; Gardner v. Railway, 43 S. E. 867; Hopkins v. Railway, 51 Atl. 404; Childs v. Railway, 33 N. J. L. 323; Railway v. Railway, 71 N. E. 1019. (3) All of the evidence shows, and the court found, that plaintiff and its predecessors had for thirty-five years a lawfully-acquired and daily-used right of way from Keokuk to St. Louis across part of defendant's property, and that the property sought to be condemned is within its hundred-foot wide right of way; and that plaintiff has the right to condemn it. This concludes defendants and the finding of the trial court will not be reviewed. State ex rel. v. Railway, 162 Mo. 399; Nickey v. Leader, 235 Mo. 43; Wellman v. St. Ry. Co., 219 Mo. 150; Brecker v. Fillingham, 209 Mo. 583.

BROWN, C.—This proceeding was instituted in the circuit court for Marion County on February 15, 1908, by petition under what is now Section 2360, Revised Statutes 1909, to appropriate by condemnation a strip of land in blocks 33 and 50 of the city of Hannibal belonging to defendant, for the purpose of constructing and operating thereon a double-track railway. The strip lies east of and adjoining the right of way of the Hannibal Bridge Company thirty feet wide upon which it operates its tracks, and, in connection with that right of way, does not exceed the width of one hundred feet at its widest part. The petition stated, in substance, that the plaintiff was a

corporation of the State of Illinois, doing business in Missouri, and owning a railroad in this State, of which the contemplated tracks across defendants' land would constitute a part; and that said tracks were necessary to facilitate the performance of its public duties.

Upon the filing of the petition in vacation commissioners were appointed to assess the damages, and upon the coming in of their report plaintiff paid to the clerk the amount of their award, and proceeded with the construction of its road, which had been completed and was in operation at the time of the trial.

At the September term, 1908, and on the 29th day of that month, the plaintiff filed a second amended petition of which the object was the condemnation of the same land for the same purpose as in the original petition. The defendants answered, admitting the ownership of the land as charged and denying every other allegation. On the same day the cause was tried to a jury on this petition and answer, and a verdict was returned assessing the damages of the several defendants on account of their respective interests in amounts aggregating seven thousand five hundred dollars. As to this amount no question is made by defendants in their briefs. On the contrary, they say that the very basis of their contention is that "neither the plaintiff nor any of its antecedent corporations ever had any located right of way" whatever over these city blocks. Pursuant to this theory they filed, at the close of all the evidence, a motion which, omitting its title and signature is as follows:

"The defendants move the court to dismiss the proceedings for the reason that the petition does not state facts sufficient to constitute a cause of action and because the evidence in the cause fails to show any right on the part of the plaintiff to condemn the property as prayed in the petition."

The facts pertinent to the issues so presented are that in June, 1875, the Mississippi Valley & Western Railway Company, a corporation formed by consolidation under the laws of Missouri and Iowa, of an Iowa

corporation of the same name, and a Missouri corporation named the Mississippi & Missouri River Air Line Railroad Company, owned a railroad extending from the west end of the railroad bridge at Keokuk, Iowa, to Hannibal, Missouri, where it connected, at a point about eighteen hundred feet south of the west end of the railroad bridge over the Mississippi River at that point, with a track belonging to the Bridge Company, and called in the record the "Wabash track." This track extended southerly from the point of connection forty-seven-hundredths of a mile, passing into the city, past the land in controversy, and, at the end of that distance, disappeared in a connection with a track belonging to the Missouri, Kansas & Texas Railway Company. Whatever business the Mississippi Valley & Western Railway Company may have had in Hannibal, including access to the bridge and transfer to other railways, was done by passing over this track. If it ever had any authority to construct or operate any railroad south of West Quincy, where the line authorized by its charter terminates, it does not appear in this record; nor does it appear that it ever located any railroad south of its connection with the Wabash track already mentioned.

On May 17, 1875, the St. Louis, Keokuk & Northwestern Railway Company was incorporated in Iowa "for the purpose of purchasing, constructing, maintaining and operating a railroad for public use in the conveyance of persons and property" from Keokuk to St. Louis, a distance of 165 miles. Section 3 of its Articles of Association is as follows: "Said road is to extend from the Keokuk and Hamilton Bridge Company's bridge at Keokuk, Lee County, Iowa, to the Mississippi River and also the Missouri Pacific Railroad Depot at St. Louis, Missouri, and such other point in the city of St. Louis as the board of directors shall determine. It being intended to purchase the railway of the Mississippi Valley & Western Railway Company, between Keokuk, Iowa, and Dardenne, Missouri, and construct and complete the same to St. Louis, Missouri."

At some time during the year 1876 it began the construction of its railroad from Hannibal south, beginning at a point of connection with the Missouri, Kansas & Texas track twenty-seven-hundredths of a mile south of the south end of the Wabash track we have described. It completed the line to Louisiana during the first year, and to a connection with the St. Louis, Kansas City & Northern at St. Peters (Dardenne) in 1879. Ever since its extension south from Hannibal and up to the institution of this proceeding, the road has been operated seventy-four-hundredths of a mile over the Wabash and Missouri, Kansas & Texas tracks described, there being no other tracks or right of way covering that distance.

In August, 1877, it filed in the office of the county clerk a profile map of its line in Marion County. The part pertinent to this case is in evidence and consists of a solid black line drawn from the north, showing the position of the Mississippi Valley & Western track to its point of connection with the "Wabash" track, from which it is continued with a dotted or broken line along the Wabash and Missouri, Kansas & Texas tracks, marked respectively with the names of those companies, to the point of connection of the latter with the new Keokuk & Northwestern track.

In 1878 (December 4th) it made a contract with the Hannibal Bridge Company by which the latter agreed to permit it to continue to operate its trains over the tracks of the Bridge Company formerly used by the Mississippi Valley & Western, in consideration of a rental of $125 per month, under reasonable rules to be prescribed by the Bridge Company, and certain privileges upon the tracks of the St. Louis, Keokuk & Northwestern. This instrument provided that the privilege granted might be revoked by the Bridge Company upon six months' notice, and that upon such revocation the railway company might proceed to condemn a right of way twenty feet wide off the west side of the Bridge Company's track to cover the gap left in its line by such revocation. It does not

clearly appear in the record that the bridge approach included in the contract covered the Missouri, Kansas & Texas track, and it is not important.

The plaintiff company acquired the property of the St. Louis, Keokuk & Northwestern Railroad Company by *mesne* conveyances not necessary to mention, in 1901, and on February 9, 1908, filed a profile map or plat for Marion County, showing the actual survey, location and distance of its road through Marion County, and its contemplated tracks over the land sought to be condemned in this suit, and gave notice to the owners of the various tracts upon which its said tracks were located, including the defendants.

This plat was practically the same in other respects as the plat of the St. Louis, Keokuk & Northwestern plat filed in August, 1877, with the exception that each of the old connections with the bridge track was marked with the words and letters "end of St. L., K. & N. W. R."

I.   It is suggested by the appellant that the St. Louis, Keokuk & Northwestern Railway Company had no power, under its charter, to construct any railroad other than that over the short distance intervening between Dardenne, in St. Charles County, to St. Louis.

Charter Powers.
They say that although the purpose expressed in its charter was to purchase, construct, maintain and operate a railroad from Keokuk to St. Louis, the expression of its intention "to purchase the railway of the Mississippi Valley & Western Railway Company, between Keokuk, Iowa, and Dardenne, Missouri, and construct and complete the same to St. Louis, Missouri" was such an assertion that its predecessor owned a completed railroad all the way from Keokuk to Dardenne that it cannot be disputed by the *fact* that it had no road between Hannibal and Dardenne, nor any authority to build one.   This ·is a misconstruction of the words of the charter, which must, of course, be construed with reference to the existing condition to which it

referred. The railroad from Keokuk to Hannibal was necessarily the railroad described in the charter as the line intended to be purchased, and its completion to St. Louis necessarily involved the construction of a line to the latter city from a connection with the purchased line at Hannibal, which was accurately described as being "between Keokuk and St. Louis." The evidence is conclusive that whatever was done toward the completion of that line was done by authority conferred in the charter of the Keokuk & Northwestern Railway Company, and in compliance with the laws of this State. The interpretation of the language of the charter suggested by defendants would be straining the words to fit an absurdity. This charter, and the laws of this State giving it life to the same extent as if it were a domestic corporation, afford the rule which must govern us in this case. It is not denied that all their faculties have become vested in the plaintiff corporation, which occupies the same position with reference to this proceeding as would the Keokuk Company had its ownership continued.

II. Although it may savor of pedagogism, we must nevertheless approach every condemnation case from the time-worn and self-evident proposition that the power to take the property of the individual for public purposes is inherent in the government which creates and protects by law the private right. That in governments like ours this power of eminent domain resides in the Legislature, and may be exercised through such agencies as it may create, subject only to the restrictions of the organic law, is equally axiomatic. [Telephone & Telegraph Co. v. Railroad, 202 Mo. 656; Railroad v. Union Depot Co., 125 Mo. 82; Bridge Co. v. Stone, 174 Mo. 1, 194 Mo. 175; City of Savannah v. Hancock, 91 Mo. 54.] Many cases to the same effect in other jurisdictions are collected in an exhaustive note to Grafton v. Railway Co., 22 L. R. A. (N. S.) 1. The general doctrine seems to be that the exercise of the right of eminent domain stands on the same footing as the power of taxation in

*Doctrine of Eminent Domain.*

the sense that both emanate from the lawmaking power, and are attributes of political sovereignty, for the exercise of which the Legislature is under no necessity to address itself to the courts. In Telephone & Telegraph Co. v. Railroad, supra, l. c. 677, this court said: ''Who is to determine the necessity, expediency and propriety of exercising this delegated right of eminent domain? Is it the courts, or the donee of this power?'' This court, through the late Judge VALLIANT, expressed the same idea in Light Co. v. Scheurich, 174 Mo. 235, l. c. 241, as follows: ''It'' (the right of eminent domain) ''is a sovereign power to be used only by the sovereign or by one on whom the sovereign has conferred it for a particular use, and when conferred it is to be treated as an invasion of the rights of the individual whose property is to be taken and therefore to be strictly construed.'' That is to say, the legislative power to exercise the right must be bestowed upon the selected agency in express terms or by necessary implications. [Telephone & Telegraph Co. v. Railroad, supra.]

The legislative discretion in this respect is limited, to be sure, by that provision of Section 20 of Article 2 of our Constitution which requires that ''whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and as such judicially determined without regard to any legislative assertion that the use is public.'' That the plaintiff's railroad, including its construction, maintenance and operation, is a public use within the meaning of this provision is not questioned nor is it open to question. The only question presented is whether the power of eminent domain conferred upon it by statute includes the right to condemn this land for the purpose stated in the petition. If so, there being no fraud alleged, the necessity for the taking is a question which must be determined by the plaintiff, and not by the court. In considering this, we shall, as we have already intimated, and as we are invited to do by the parties in their briefs, ignore the several transfers made after the acquisition of title to the property by

the St. Louis, Keokuk & Northwestern Railway Company, and 'assume that the plaintiff is simply standing in its shoes.

III.  That the railway company, when this proceeding was begun, had been operating its trains between Keokuk and St. Louis along a track passing within a few feet of this land, and forming a part of its continuous line, would seem to be a visible demonstration that the road had been located, which needs no aid from the "profile map" filed thirty years before, but the rule that the legislative power invoked by plaintiff must be clear and explicit, calls for an examination of the relation of this map to the power asserted.

Map and Profile.

At the time the Keokuk Company was incorporated and qualified to transact the business of its incorporation in this State, such corporation was authorized "to lay out its road, not exceeding one hundred feet in width, and to construct the same, and for the purpose of cuttings and embankments to take as much more land as may be necessary for the proper construction and security of the road" (G. S. 1865, p. 332, sec. 2, par. 3) and was required (Id., p. 337, sec. 12) before beginning the construction of its road or any part thereof into or through any county named in its articles of association, to make a map and profile of the route intended to be adopted by such company in such county, and to file the same in the office of the county clerk, and to give notice to every person occupying lands over which the route of the road is so designated, and which has not already been acquired by purchase or donation.

It will be noted that this law did not require the filing of any map of the right of way, but only of the *route intended to be adopted*.  By act approved April 24, 1877 (Law 1877, p. 369, sec. 1) the present law (R. S. 1909, sec. 3074) it was specified that the map should show the actual survey, location and distance of the *roadbed* through each congressional section of the county.  We

think that the careful insertion of the word "roadbed" in this act excludes the idea that it was intended to include a map of the right of way, and left the power of the corporation with reference to the width of its road as expressed in the clause we have quoted from the General Statutes unaffected. That this was necessarily the legislative intent is also apparent from its provisions. The map is required to be filed before constructing any part of the road through the county. The construction contended for would prohibit any provision in land for protection against such infirmities as might develop in the ground during construction, and might render it impossible to modify its grade by additional cuttings and embankments to meet the growth of its traffic. It is not the policy of our laws that the wonderful growth of our country should be provided and paid for in advance and the cost charged upon the people as additional transportation expense, but that these facilities should go hand in hand with the prosperity of the country. Without determining whether or not the profile map has any connection with the right of plaintiff to maintain this proceeding, we hold that it is sufficient as an exhibit of the conditions then existing, and that the fact that it was not filed until after the beginning of the work in Marion County does not affect the power of eminent domain conferred upon plaintiff by the statutes.

IV. At the time of the construction of its railroad south from Hannibal the Keokuk & Northwestern Railroad Company, instead of building its own track through that city, made a written contract by which it was authorized to use a track of the Hannibal Bridge Company for a distance of about three-fourths of a mile, and ever since the completion of its line, and covering a period of about thirty years before the institution of this proceeding, it has moved all its traffic, including many trains daily between Keokuk and St. Louis, over this track. The bridge track so used was situated on the east side of a right of way thirty feet wide upon

Use of
Connecting
Track
Under
Contract.

which it maintained two tracks for a portion of the distance, including the track used by plaintiff and its predecessors. This contract gave the Bridge Company the right to terminate it at will upon notice and in case of such termination gave the Railroad Company the right to condemn land for a track off the west side of the thirty foot strip. The petition states, in substance, that the business of the plaintiff now requires two tracks, for right of way for which this proceeding is instituted.

The statute in force since before the incorporation of the Keokuk Company (R. S. 1909, sec. 3212) provides that if the Railway Company "shall not finish its road and put it in operation in ten years from the time of filing its articles of association . . . its corporate existence and powers shall cease: Provided, that if a portion of its road shall be finished and in operation, it shall continue its corporate existence, with power to hold and manage the portion of its road so constructed, and for no other purpose." The defendants contend that, having failed to construct its road over the three-quarters of a mile covered by the use of the bridge track, the corporate powers of the Keokuk Company, including the right of condemnation, ceased, and it was without a charter covering that portion of its line. This leads necessarily to the consideration of the question whether under the provision of the statute we have just quoted it did "finish its road and put it in operation." Section 3106, Revised Statutes 1909, which has been in force since 1866, provides as follows: "All railroad corporations may contract with each other, or with other corporations, in any manner not inconsistent with the scope, object and purpose of their creation and management." This section is comprehensive and has been comprehensively construed by this court in St. Joseph & St. Louis Railroad Co. v. St. Louis, Iron Mountain & Southern Railway Co., 135 Mo. 173. It includes in its categories all railroad companies and all subjects tending towards the carrying out of the purposes of their creation and management. It is frequently of interest to the public that two tracks should not be required where one is entirely sufficient for the

service. [Joy v. St. Louis, 138 U. S. 1.] And, as we have intimated in a previous paragraph, useless construction tends to increase the burden of the public in transportation charges. Under this statute the Railroad Company has the right to contract with the Bridge Company that the track of the latter might be used for all purposes of operation required of the former by the laws which constituted its charter, so long as it should prove amply sufficient for the use of both; and when it should become insufficient it was the duty of each to provide such further facilities as the satifactory performance of its public duties might require. It is true that the instrument embodying the contract did not in this case constitute a lease. The power to regulate the use of the Keokuk Company by reasonable regulations was expressly reserved. It was an operating arrangement by which the track became available to the Keokuk Company for all the purposes for which it was incorporated, and the Bridge Company's tracks thereby became a part of the Keokuk Company's line from Keokuk to St. Louis to the same extent as if it had constructed it and granted to the Bridge Company the right to share in its use. The provision of the contract that should the right to use this track be withdrawn, the Keokuk Company might condemn twenty feet of ground on the west side of it held by the Bridge Company as a part of its right of way need not be considered in connection with this question. The railroad company was under no obligation to avail itself of the privilege, and the fact that a double track is now necessary to the transaction of its business charges it with the duty to employ its char-ter powers to furnish that facility.

We think that the "profile map" filed by the Keokuk Company in April, 1878, properly and plainly shows the situation as we have stated it. It shows the railroad constructed and to be constructed by that company and also that the gap of three-quarters of a mile was to be connected by the tracks designated as the Toledo, Wabash & Western and the Missouri, Kansas & Texas

tracks, and that these together with the plaintiff's track constituted a continuous line. We can see nothing in the statute specifying the character of the lines to be used in the profile of the roadbed. It was here necessary and proper to distinguish between all the tracks owned by the railroad company and those over which it merely had operating rights. We think the line at this point was, within the meaning of the statute, finished and in operation within the ten years allowed by this statute, and that the profile map in question was sufficient for the purpose of this proceeding.

V. The real question in this case is raised by the assertion of the defendant that the arrangement with reference to trackage and right of way between the Keokuk Company and the Bridge Company constituted an abandonment by the former of the right to condemn the defendants' property. In other words it elected to stand forever upon the rights so acquired. As authority for the position, they cite Joplin & Western Railway Co. v. Kansas City, Ft. Scott & Memphis Railroad Co., 135 Mo. 549; Kansas City Interurban Railway Co. v. Davis, 197 Mo. l. c. 676; and Roanoke Investment Co. v. Kansas City & Southeastern Railway Co., 108 Mo. 50. Before proceeding further with the question so presented we will notice these cases. The Joplin case was injunction to prevent defendant from constructing its track over a strip of land twenty-five feet wide adjoining the smelter of the Empire Zinc Company, to be used as a spur to serve that industry. The strip mentioned was all the land lying between that industry and a strip twenty-five feet wide which the plaintiff had purchased from the Zinc Company for the same purpose, and upon which it was already constructing its track and had filed its profile map. The defendant contracted with the Zinc Company for a conveyance of the intervening twenty-five feet and immediately took possession and prepared to build its track thereon. Afterward and on the same day plaintiff commenced proceedings to condemn for "main track and side track" the land

for which defendants had contracted, and brought this suit for injunction. This court said: "In view of those facts plaintiff must be held to have elected to take and hold twenty-five feet for its right of way instead of one hundred feet as authorized by the statute and whatever lien upon or right to the land it may have secured by locating its road and filing its map will be confined to the quantity it elected to take." The plaintiff's contention was "that by adopting its route and making and filing its profile map, it became entitled to take by purchase or condemnation, and hold, for its right of way, one hundred feet of the land of the Zinc Company upon which a lien, or right, became impressed, which could not be defeated by the sale and conveyance by the owner to defendant." The court said that it did not think the record required it to consider these questions and states that "the statute does not require that the right of way shall be one hundred feet wide, but gives the corporation power to take and hold land for that purpose not exceeding one hundred feet in width. The railroad company may take less, but it cannot take more than one hundred feet, except for the purpose mentioned. As between the corporation and the landowner and his grantees, the right of way is restricted to what was originally claimed. If it should be afterward found that additional land is required, the corporation would have to deal with those who might then be interested." It will be seen from the above that the court refused, when it was presented, to discuss the question presented by defendants in this case, and disposed of the case on the sole ground that by the location of its road and filing of the profile map the plaintiff acquired no lien upon the strip of land it was authorized to take as the maximum of the right of way. That consequently the owner might convey it and that his conveyance would transform the transaction to one between the railroad company and the new owner. We can see no hint in this case of any intention to decide that the right of

condemnation would be cut off as against any one so taking the title for his own instead of a public use.

The Interurban case is covered by the following paragraph in the syllabus: "The power given to a railroad company to condemn private property for its own use is to be exercised within strict limits. The law does not authorize the incorporating of a company with a roving commission to go anywhere in the State and condemn land in spots." The only question was as to whether a charter authorizing the construction and operation of a road from Kansas City to Pleasant Hill, Missouri, had given the corporation the right to condemn land for the construction and operation of a railroad from a point in Kansas City to Swope Park. This court held that these were two separate propositions, and that it did not have that right. In the Investment Company case, which was injunction, it was held that the right of way had been abandoned and the road built upon another line.

There is nothing in any of these cases, nor in any other Missouri case that we have been able to find, that supports the point to which they are cited. On the other hand there is much in the text books and in the adjudication in other jurisdictions against it. In Lewis on Eminent Domain (3 Ed.), sec. 403, the rule, with some of the reasons supporting it, is stated as follows: "In the absence of any restriction or limitation, the power to take private property may be exercised by the grantee from time to time as necessity requires. If this were not so, it would be necessary to anticipate all future needs at the outset. The company condemning would thus not only have to take and pay for property in advance, but it might be saddled with property which it would never use at all. On the other hand, either from taking too narrow a view of the future or from the growth of business beyond any reasonable anticipation, it might in a few years find itself unable properly to discharge its duties to the public. Accordingly a railroad company, after having located and completed its road, may, as the expansion of its business

requires, and within the limitations imposed by statute, if any, take additional land for right of way."

Mr. Nichols, in his excellent work on the same subject just published, says: "After the railroad has been constructed, land may be taken for additional main tracks, if needed for expeditious public travel." [P. 189.]

The English case of Ayr Harbour Trustees v. Oswald, 22 English Ruling Cases, 167, 8 App. Cas. 6𝟝𝟝, is directly in point. In that case, which was for condemnation of lands for roadway and wharves for access to a harbour, it was held in the House of Lords that the trustees of the harbour could not limit the amount of damages by an agreement that it would not erect certain structure that would embarrass the owner's access to the harbour from his remaining lands. Lord BLACKBURN, who wrote the opinion, placed the decision on substantially the following grounds: The right to the appropriation depended upon the public use to which the lands were to be appropriated; that their appropriation under an act which made no provision for a restricted use was inconsistent with such limitations and the limitation void. While it is unnecessary for us to express any opinion upon that decision, which goes beyond the region we must traverse in the consideration of the case before us, we cordially approve the doctrine that it is not within the power of a railway corporation to barter away or otherwise surrender the powers granted it for the benefit of the public, but they must remain ready to exercise them whenever the public interest requires it. They cannot exercise the rights granted them and at the same time repudiate the duties imposed as compensation for those rights.

Our statute (R. S. 1909, sec. 3049) gives to the railway company the right "to lay out its road, not exceeding one hundred feet in width, and to construct the same; and, for the purpose of cuttings and embankments, to take as much more land as may be necessary for the proper construction and security of the road." No distinction is made in the matter of time

or otherwise, between lands taken or held by grant or condemnation or between lands acquired outside the one hundred feet limit or inside it.  Should the exigencies of the traffic require that the grade should be reduced by higher embankments and deeper excavations than could be constructed and maintained in the width limited, or if erosion by a water course or a necessity for drainage or any other condition requiring more lands for protection of the tracks against it should occur, the right to take the additional land is, so far as the words of the act go, subject to the same limitations as the right to take the original one hundred feet.  We mention this for the purpose of pointing out that there is nothing in the words of the act which indicate a limitation of the time of taking land required by any condition relating to construction, protection or improvement.  All these questions are left to be determined as the conditions occur.  The only reasonable construction that can be placed upon this clause is that the one hundred feet is available everywhere, and always by either condemnation or purchase, while the power to take additional land must depend upon the emergency that calls it into being.  This question, arising under similar statutes relating to the width of the right of way, has come before the courts of other states, which have always held in accordance with the view we have expressed. [Hopkins v. Philadelphia, Wilmington & Baltimore Ry. Co., 94 Md. 257; Childs v. Central Railroad Co., 33 N. J. L. 323; Chicago & M. Elec. Ry. Co. v. Chicago & N. W. Ry. Co., 71 N. E. l. c. 1019, column 2.]  The Maryland case above cited is "on all-fours" with the case at bar, and the New Jersey case cannot be distinguished in principle.

The power with respect to the width of the road not only confers a right upon the public corporation, but imposes upon it the duty to exercise that right whenever the public service requires it.  It has been said with what we consider much reason that "a municipal corporation to which the power of eminent domain has been granted cannot lawfully contract that

the power will not be exercised in a particular manner, and a like rule applies to a private corporation. The power is given to be used when public necessity or convenience requires it, and when such an occasion arises private contracts cannot stand in the way." [Nichols on Eminent Domain (2 Ed.), p. 77.]

The judgment of the circuit court is in accord with the principles above stated and it must therefore be and is affirmed.

*Railey, C.,* concurs.

PER CURIAM:—The foregoing opinion of BROWN, C., is adopted as the opinion of the court. All of the judges concur.