TERMINAL SHARES, Inc., v. CHICAGO, B. & Q. R. CO.

No. 3573.

District Court, E. D. Missouri, E. D.

May 6, 1946.

Samuel H. Liberman, B. L. Liberman, and Donald J. Meyer, all of St. Louis, Mo., for plaintiff.

Andrew C. Scott, of Chicago, Ill., William S. Hogsett and Hale Houts, both of Kansas City, Mo., Wilder Lucas, of St Louis, Mo. (J. C. James, of Kansas City, Mo., and Walter McFarland and Eldon Martin, both of Chicago, Ill., of counsel), for defendant.

HULEN, District Judge.

This is an equity suit in which plaintiff seeks injunctive relief and damages in the sum of five million dollars. The action is based upon a claim that plaintiff and defendant were engaged in a joint adventure and that defendant violated its obligation to the joint adventure by prosecuting certain condemnation proceedings to acquire property used in the joint adventure and plaintiff sustained damages as a result of such action. Plaintiff seeks to enjoin further prosecuting the condemnation cases. Defendant has filed a motion for summary judgment. It is now before the Court for ruling.

The controversy arose out of stock ownership of plaintiff and defendant in corporations holding title to real property in Clay County, Missouri, located north of the Missouri River, and referred to as the North Kansas City properties. Prior to 1903, Armour Packing Company and Swift Packing Company acquired the tract of land, consisting of some three thousand acres. Various corporations, among which is the North Kansas City Development Company, hold title to respective parts of the tract. In 1903, Armour and Swift decided to develop part of the area for industrial and terminal uses. Concluding their plans would be served by offering to prospective purchasers of industrial sites trunk line railroad service, they interested defendant in the enterprise. Defendant acquired one-third of the stock of the corporations which held title to the land. Armour then held one third and Swift one third. Defendant, Armour and Swift, each contributed funds,

680

in equal parts, which were used in developing the property. Commencing in 1912, lead tracks were constructed to serve industries located on the tract. These lead tracks were served by the defendant until 1921 without payment of rent; from 1921 to 1944, under a lease from the development company, providing for a stated rental. In October, 1944, the lease was cancelled, and since that time the defendant has operated over the tracks at a rental to be fixed by suit now pending in the Federal Court in Kansas City. There is no record that defendant, Armour and Swift ever reduced to writing their understanding for development of the industrial site. It is now plaintiff's position that after defendant purchased a third of the stock of the holding corporations, the agreement, by implication, under which defendant, Swift and Armour operated and developed the North Kansas City property, created in law as between them a joint adventure.

In 1929, Armour and Swift signed a contract with the Geneva Corporation, nominee of the Allegheny Corporation, for the sale of the stock owned by them in the holding corporations. Title was taken in plaintiff, as one of the Allegheny Corporation's subsidiary companies. This purchase of a two-thirds stock interest by plaintiff was kept secret from the defendant. Defendant claims it did not learn of the identity of the purchaser until 1933. Plaintiff claims defendant received information prior to that date. The true date is not material. Plaintiff purchased the stock interest as a part of its plan to sell the stock to the Missouri Pacific Railroad. The Allegheny Corporation was at that time acquiring stock of the Missouri Pacific Railroad.

Plaintiff states its position: "that it acquires its rights as a joint adventurer (not) by and through the mere acquisition of stock in the North Kansas City companies, but on the contrary there was an independent agreement for joint adventure entered into in 1903 by and between Armour, Swift, and the Burlington, and that such agreement was not terminated by the sale from Armour and Swift to plaintiff, but continued as between plaintiff and the defendant, as a result of the defendant's consent thereto implied from its conduct and the facts and circumstances." (From plaintiff's brief.)

Defendant brought suit in 1938 in the Federal Court in Kansas City to condemn nineteen of the lead tracks constructed to serve the industries which had located on the North Kansas City property. The defendant in the case was the North Kansas City Development Company. It resisted the power of the defendant to condemn, but without success. Chicago, B. & Q. R. Co. v. North Kansas City Development Co., 8 Cir., 134 F.2d 142, certiorari denied 319 U.S. 771, 63 S.Ct. 1437, 87 L.Ed. 1719. The judgment on damages was reversed and the cause remanded for new trial solely on that issue. This case is now awaiting retrial in the Federal District Court in Kansas City. After the condemnation suit was remanded, defendant in that case filed an action against the Burlington for the purpose of securing access to certain records showing defendant's earnings from freight which had moved over the lead tracks, on the theory that such was a part of the damages it was entitled to in the condemnation suit. The District Court denied discovery and overruled plaintiff's (in that case) theory of measure of damages. 64 F.Supp. 772. The ruling was affirmed on appeal. 8 Cir., 147 F.2d 161, certiorari denied 325 U.S. 867, 65 S.Ct. 1405, 89 L.Ed. 1986. In 1944, the Burlington brought another condemnation case to condemn additional lead tracks not included in the original suit. That case is now pending for trial in the District Court in Kansas City.

In March of 1940, plaintiff entered into a contract with the trustee in bankruptcy of the Missouri Pacific Railroad, for the sale to the railroad of the two-thirds stock interest owned by plaintiff in the corporations holding title to the North Kansas City properties, for a consideration of six million dollars. The contract of sale was conditioned, among other things: "To the condition that a certain condemnation suit instituted by the Chicago, Burlington & Quincy Railroad Company for the condemnation of certain properties of North Kansas City Bridge and Railroad Company, pending in the District Court of the United States at Kansas City, Missouri, shall be

finally terminated adversely to the plaintiff or by it voluntarily dismissed, with prejudice, or, if dismissed without prejudice, it shall have been finally determined in a court of competent jurisdiction, by declaratory judgment or otherwise, that said Chicago, Burlington & Quincy Railroad Company has no right to condemn the properties involved in said condemnation suit."

Plaintiff asserts that as a direct and proximate result of the act of defendant "in prosecuting the said condemnation suits and obtaining a decree and adjudication it is entitled to condemn, the plaintiff has lost the value of the said contract" with the Missouri Pacific Railroad, "and been damaged in the sum of Five Million Dollars." (See Complaint.) Plaintiff alleges, as the basis of its complaint against defendant, that defendant's conduct in prosecuting the condemnation actions constitutes a "gross violation of the fiduciary obligation owed by the defendant to the plaintiff as a party to the joint adventure of promoting the North Kansas City properties." (From plaintiff's brief.)

Defendant's motion for a summary judgment, based upon seven points,[1] assumes that under the pleadings, depositions, admissions and affidavits in the present record, there is no genuine issue of fact to be tried.

I. Plaintiff challenges defendant's position that there is no real issue of fact as to the existence of a joint adventure between Terminal Shares, Inc., and the Burlington Railroad. There are many undisputed facts in the record inconsistent with the relationship of joint adventure between plaintiff and defendant. They speak in no uncertain terms in support of defendant's claim that prior to the institution of this suit neither party recognized the existence of such a status. These facts raise a serious question as to plaintiff and defendant ever embarking on a joint adventure. For example, plaintiff cannot designate the place nor fix the time of the birth of the joint adventure agreement, either as between defendant, Armour and Swift, or as between plaintiff and defendant. Regardless of the relationship of Armour, Swift and defendant, it is clear defendant did not consent to the sale of the Armour and Swift interests to plaintiff, prior to or at the time of the sale. Defendant had no knowledge of the sale. An interest in a joint adventure cannot, as such, be transferred without the consent of the owner of the remaining interest, any more than one partner can substitute a stranger in its place in the partnership without consent of the owner of the remaining interest.[2] The relationship of joint adventure is necessarily one of intention, and such an intention must be determined in accordance with the ordinary rules governing the interpretation and construction of contracts.[3]

---

[1] The seven points are:

1. No joint adventure has ever existed between plaintiff Terminal Shares, Inc., and defendant Burlington Railroad.

2. The alleged joint adventure would in any event be void and unenforceable because of plaintiff's failure to comply with the foreign corporation statutes of Missouri.

3. The lack of merit in plaintiff's claim has been settled by the decisions in Condemnation Case No. 82 and the Discovery Suit. These decisions are res judicata.

4. Plaintiff's claim is barred by laches.

5. The damages for alleged loss of the Thompson contract are not recoverable because not within the reasonable anticipation of the parties.

6. There is no merit in the claim that plaintiff lost the Thompson contract as a result of the continued prosecution of the condemnation case.

7. Plaintiff is not entitled to an injunction because it has a plain, adequate and complete remedy at law.

[2] In the case of In re Gotfried, D.C. 1942, 45 F.Supp. 939, it was held one co-adventurer could not automatically terminate the relationship by a sale of his interest without the knowledge and consent of his associate; Rowley Modern Law of Partnership (1916) Sec. 201, "Delectus personanum—choice of partners"; Lindley on Partnership, 9th Ed., 1924, p. 448; Joint Adventure—Extent to which Partnership Law Applies, 35 Mich.Law Review, p. 297; Parsons on Partnerships, 2d Ed., p. 166; Burnet v. Leininger, 1932, 285 U.S. 136, 52 S.Ct. 345, 76 L.Ed. 665.

[3] See Denny v. Guyton, 327 Mo. 1030, 40 S.W.2d 562; 33 C.J. 841, and Mechem,

■ We have read the contract of sale between plaintiff and Armour and Swift. It contains no reference, express or implied, to a joint adventure concerning the property transferred. Armour and Swift represent in the contract that they "are the owner of shares of stock" in the corporations "whose stock is being sold." The sellers agree "to deliver" the shares of stock. Nothing else. They agree to operate "in the usual manner" the business of the companies prior to closing of the sale. They could control the companies as majority stockholder. This contract is dated October 16, 1929. Ten years later, when plaintiff contracts to sell the same "stock" to the Missouri Pacific Railroad trustee, the contract of sale is again silent, by express reference or by implication, on the subject of joint adventure. In the last contract of sale, like terms are used as in the contract of 1929 as to plaintiff furnishing the resignations of officers and directors in the corporations and operating the property in the usual manner. The contract of sale to the Missouri Pacific is in some respects different from the 1929 contract. Plaintiff binds itself that "no dividends shall be paid"; to secure the "written resignations of such officers of said companies as shall be requested" by the buyer. Plaintiff warrants that it has the *"unqualified"* right to deliver to the purchaser its possession and "interest" in the North Kansas City properties. A member of a joint adventure does not have an unqualified right to dispose of its interest in a joint adventure. The terms and conditions of the contract are foreign, and when considered with the surrounding circumstances, may be considered hostile to recognition by either party to the contract of a joint adventure in the operation of the properties with the Burlington Railroad. This contract was executed some two years after defendant initiated its first condemnation suit, which plaintiff now asserts to be in violation of its duty to the joint adventure. Plaintiff showed no recognition of any duty to defendant in a joint adventure in the

properties, in its negotiations for sale to the Missouri Pacific Railroad. We find it hard to believe that the parties who executed these contracts, which are so specific and detailed in their terms, evidencing extreme care on the part of both buyer and seller to define with particularity what was being sold and purchased, had any intention to convey or purchase an interest in a joint adventure or that either party was aware of the existence of a joint adventure in connection with the property sold. One of two conclusions appears inevitable. Either the parties to the joint adventure have been ignorant of the law governing their relationship or unaware of the existence of the relationship. From the time plaintiff entered the scene, plaintiff and defendant have engaged in corporate warfare. Plaintiff endeavored to wrest from defendant use of the lead tracks and business of serving the industries located on them, and defendant, using the power at its command, has sought to retain possession of the lead tracks and the business of serving the industries located on them.

Plaintiff contends there is in the record, consisting of affidavits and accompanying documents of approximately 500 pages, 4000 pages of testimony by deposition, and over 500 exhibits, substantial evidence that at various times, the parties, including defendant, have referred to the operation of the North Kansas City properties as a "syndicate"—"Armour-Swift-Burlington Syndicate"—"A. S. B. Syndicate"—"syndicate lands"—"syndicate properties"—"syndicate investment"—"syndicate books"— "partnership" — "joint interests" — "joint ownership." There is authority to support plaintiff's claim that the term "syndicate" has sometimes been used to identify or designate a joint adventure.[4]

■■ To rule at this time on the issue of joint adventure would, in our opinion, require the weighing of testimony and the inferences and conclusions to be drawn from use of the term referred to, based upon the surrounding circumstances and conditions. It is our opinion that upon a rec-

The Law of Joint Adventures, 15 Minn. Law Rev., at 662.

4 30 Am.Juris. 677; Nowland Realty Co. v. Commissioner of Int. Rev., 7 Cir., 47 F.2d 1018; Hathaway v. Porter Royalty Pool, 296 Mich. 90, 295 N.W. 571, 138 A.L.R. 955.

ord of the character here presented, the plaintiff should be afforded a trial. We are not prepared to say movant is entitled to the relief sought beyond all doubt; that there is no room on the record for debate. Such being the case, defendant is not entitled to summary judgment.[5] Therefore, if the only question presented by defendant's motion was existence or non-existence of a joint adventure, it would be overruled. For like reasons, our position is the same on the points urged by defendant in support of its motion, that plaintiff is doing business in the State of Missouri (without having complied with the foreign corporation statutes of Missouri) and that plaintiff's claim is barred by laches.

II. Defendant next urges that it could not, lawfully, enter into any agreement or association which would have the effect, express or implied, of preventing it from exercising its privilege of eminent domain. On this issue, plaintiff's counsel conceded in oral argument that the question was one properly determinable on motion for summary judgment, and if defendant's position is correct, plaintiff's case must fail. It is defendant's position, as set forth in its brief, that the decisions heretofore rendered in the condemnation cases make the point res adjudicata. The view we take makes it unnecessary to pass on the application of the plea of res adjudicata.

█ The power to condemn is given to be used whenever public convenience calls for it. It has no other use. Whenever such an occasion arises, private contracts, express or implied, cannot thwart the public convenience. The Court of Appeals, in passing upon the condemnation case, 134 F.2d 142, loc. cit. 151 held: "The rule is well settled in Missouri, as it is generally, that, since the power of condemnation is granted in the public interest, there can be no estoppel against its exercise from any private actions between the condemnor and the condemnee. Chicago, B. & Q. R. Co. v. McCooey, 273 Mo. 29, 200 S.W. 59, 64, 65; City of Moberly v. Hogan, 317 Mo. 1225, 1230, 298 S.W. 237, 239; [State of] Georgia v. City of Chattanooga, 264 U.S. 472, 44 S.Ct. 369, 68 L.Ed. 796; Nichols, Eminent Domain, 2d Ed. pp. 75-79; Lewis, Eminent Domain, 3rd Ed. p. 737." [6]

█ Plaintiff, recognizing the force of this rule of law, to avoid its effect contends that the relationship of those engaged in a joint adventure is of such a high character, and the duties of co-adventurers to each other are of such a strong fiduciary nature as to preclude one of the joint adventurers from obtaining a part of the property used in the joint adventure, by any method, for its individual use, against the will of the other party to the enterprise. Plaintiff's desire thus to broaden the general rule which defines the duty of joint adventurers to the enterprise to include estoppel of a party to the joint adventure from exercising the power of eminent domain must be denied. The power of eminent domain is conferred upon a railroad corporation as one in trust, to be exercised in promoting the public interest. Power to condemn property is not a power owned by a railroad corporation as one of its assets, that it may barter about and pass as a consideration in contracts and agreements, either express or implied. It has no such title in the power. If the parties could not expressly create a joint adventure, and the defendant therein agree to abstain from the exercise of the right of eminent domain, such a provision would not be read

---

[5] Walling v. Fairmont Creamery Co., 8 Cir., 139 F.2d 318; Doehler Metal Furn. Co. v. United States, 2 Cir., 149 F.2d 130; Shultz v. Mfg. and Traders Trust Co., D.C.W.D.N.Y., 1 F.R.D. 451.

[6] If interested in authorities from other jurisdictions, text-writers and historical background of this principle of law, see: Ayr Harbour Trustees v. Oswald, L.R. 8 App.Cas. 623, 22 Eng.Rul.Cas. 167, House of Lords; 6 Fletcher on Corporations, Perm.Ed. p. 942, to the effect that a contract being property, may be the subject of condemnation; 29 C.J.S., Eminent Domain, § 4, p. 782, to the effect that the power of eminent domain is a sovereign power, essential to the public welfare and cannot be surrendered, and citing in support thereof State of Georgia v. City of Chattanooga, 1923, 264 U.S. 472, 44 S.Ct. 369, 68 L.Ed. 796; City of Norton v. Lowden, 10 Cir., 1936, 84 F.2d 663; Chicago, Burlington and Q. R. Co. v. McCooey et al., 1917, 273 Mo. 29, 200 S.W. 59, loc. cit. 64, and City of Moberly v. Hogan, 1927, 317 Mo. 1225, 298 S.W. 237.

into an "implied" contract of joint adventure, or implied in a contract of joint adventure. Plaintiff is presumed to know the law, and knowing that defendant was without power to contract or barter away its powers of condemnation, the plaintiff must have contracted or associated itself with defendant on the basis that no such provisions would be implied in the agreement or association.

Plaintiff, represented by able and resourceful counsel, has offered no authorities to sustain its position. The Court has found none. There is authority of the highest order that a corporation possessing condemnation powers will have the right to exercise such power read into a contract which is silent on the subject.

In the West River Bridge Company v. Dix, 1848, 6 How. 507, 532, 12 L.Ed. 535, the right of a subdivision of the State of Vermont to condemn a certain bridge for highway purposes was contested. The bridge had been constructed by a corporation created by the legislature of Vermont, invested with the exclusive privilege of erecting the bridge and taking tolls for traffic passing over it. It was claimed by the bridge company that the franchise grant from the State of Vermont constituted an *implied* contract and that the taking of the bridge in condemnation proceedings violated Section 10 of the First Article of the Constitution. What the Supreme Court said in this case with respect to implied conditions we think particularly applicable to the case now before this Court: "But into all contracts, whether made between States and individuals *or between individuals only,* there enter conditions which arise not out of the literal terms of the contract itself; they are su-perinduced by the pre-existing and higher authority of the laws of nature, of nations, or of the community to which the parties belong; *they are always presumed, and must be presumed to be known and recognized by all,* are binding upon all, *and need never, therefore, be carried into express stipulation, for this could add nothing to their force.* Every contract is made in subordination to them, and must yield to their control, as conditions inherent and paramount, wherever a necessity for their execution shall occur. *Such a condition is the right of eminent domain.* This right does not operate to impair the contract effected by it, but recognizes its obligation in the fullest extent, claiming only the fulfillment of an essential and inseparable condition." (Emphasis added.)[7]

We conclude the plaintiff's inability to meet the conditions in the sales contract with the Missouri Pacific trustee was not due to a violation of any lawful contract duty existing between plaintiff and defendant, nor a breach of any obligation owed by defendant to any relationship, joint adventure or otherwise, existing between plaintiff and defendant; and defendant acted within its legal rights in prosecuting the condemnation proceedings complained of by the plaintiff.

Dismissal of the condemnation proceedings was one of the conditions upon which execution of the contract between plaintiff and the Missouri Pacific trustee was based. There was another: "In addition, the obligations of the MOP Trustee under said Section 2 shall be subject to (a) the acquisition by North Kansas City Bridge and Railroad Company of all necessary right and authority to construct and use in interstate and intrastate commerce

---

[7] For other authorities to the same effect, see Southern Indiana Gas & Elec. Co. v. City of Boonville, 1939, 215 Ind. 552, 20 N.E.2d 648, 652, holding the power of eminent domain "must be presumed to be known * * * and need never be" stated in a contract "for this would add nothing to its force"; Riden v. Philadelphia B. & W. R. Co., 1943, 182 Md. 336, 35 A.2d 99, 104, holding contracts which attempt to impair the power of eminent domain are "void as being contrary to public policy"; Kettle River R. Co. v. Eastern R. Co., 1889, 41 Minn. 461, 43 N.W. 469, 6 L.R.A. 111; North Pennsylvania Ry. Co. v. Davis, 1856, 26 Pa. 238; In re First Street, 66 Mich. 42, 33 N.W. 15, 21, holding, "all contracts * * * must be regarded as made with reference" to the law that the power of eminent domain cannot be restricted by agreement; Brimmer v. Boston, 1869, 102 Mass. 19; Mobile & O. R. Co. v. Mayor, etc. of Union City, 1917, 137 Tenn. 491, 194 S.W. 572; Elliott on Railroads, 2d Ed., 1907, p. 470; Cooley on Constitutional Lim., 7th Ed., p. 754; 18 Am.Jur. p. 650.

an overhead crossing over the rights of way and tracks of the Chicago, Burlington & Quincy Railroad Company and the Wabash Railroad Company at or in the immediate vicinity of the place heretofore approved therefor by the Public Service Commission of the State of Missouri, together with tracks located thereon, such crossing and tracks to connect at the southerly extremity thereof with the present railroad tracks of North Kansas City Bridge and Railroad Company at the north end of the Armour-Swift-Burlington Bridge in North Kansas City, Missouri, and, at the northerly extremity thereof, with the lead tracks next below referred to (b) the acquisition by North Kansas City Bridge and Railroad Company of all necessary right and authority to construct and use in interstate and intrastate commerce lead tracks extending from a connection at the southerly end thereof with tracks located on said overhead crossing to connections with all existing tracks of North Kansas City Bridge and Railroad Company serving industries located in said North Kansas City, including, but not limited to, connections with tracks of North Kansas City Bridge and Railroad Company connecting with industrially owned tracks in North Kansas City."

The sales contract with the Missouri Pacific trustee is dated March 12, 1940. In 1943 the Court of Appeals in the condemnation case, 134 F.2d 143, 148, held the North Kansas City Bridge and Railroad Company had in 1911 forfeited the railroad powers under its charter because of failure to comply with the laws of Missouri requiring certain railroad construction within a fixed period. The Court held: "The statute is self-executing and no judicial declaration is required to effect the forfeiture, whether it be total or partial, so that the failure of a railroad corporation to complete the special undertakings of its charter, in ten years, automatically divests it of its general railroad rights and powers."

Plaintiff takes the position that since defendant had made it impossible for plaintiff to comply with one of the conditions of its contract with the Missouri Pacific trustee, by the continued prosecution of the condemnation cases, defendant should not be heard in excuse of liability for its act to say that even if it had dismissed the condemnation cases, plaintiff could not have met the conditions of the contract with the Missouri Pacific trustee calling for the North Kansas City Bridge and Railroad Company to obtain from the Public Service Commission of the State of Missouri authority "to construct and use in interstate and intrastate commerce" certain overhead crossings and tracks. In light of the holding of the Court of Appeals that the forfeiture statute is self-executing, we conclude that as a matter of law, the bridge company would be without any right to appear before either the Interstate Commerce Commission or the Public Service Commission of Missouri as a railroad seeking orders and authority applicable only to railroads.[8] Failure to secure dismissal of the condemnation suits is not the direct and proximate cause of failure of plaintiff to meet the conditions of the contract of sale to the Missouri Pacific trustee and resultant alleged damages. Plaintiff would have the Court believe it might have succeeded in running the gauntlet of Federal and State commissions without the true status of the bridge company becoming known, as had been its previous experience before the Missouri Commission. Viewed most favorably to plaintiff, this is at least a contingency.[9] Damages for contract violation cannot be subject to such a contingency. This Court will not presume that petitions would be entertained and orders and authority issued by the Commissions to a corporation as a railroad corporation, which was suffering the disabilities of the North Kansas City Bridge and Railroad Company. We presume the Commission would learn the truth and follow the law.

---

[8] "The jurisdiction of the Commission is limited * * * to corporations, persons, firms, or copartnerships serving the public." State ex rel. Kansas City Southern v. Public Service Commission, 325 Mo. 862, 30 S.W.2d 112, loc. cit. 117.

[9] See Western Union Tel. Co. v. Ivy, 8 Cir., 177 F. 63 and Karrick v. Rosslyn Steel & Cement Co., 58 App.D.C. 89, 25 F.2d 216.

We do not deem it necessary to pass on remaining points urged by defendant in support of its motion for summary judgment.

Findings of fact, conclusions of law and order may be submitted under District Court rule.