13 F.Supp. 888 (1935)
In re MISSOURI PAC. R. CO.
No. 6935.
District Court, E. D. Missouri, E. D.
November 15, 1935.
William H. Boyd, of Cleveland, Ohio, for Missouri Pac. R. Co.
C. M. Clay, James B. Alley, Max O'Rell Truitt, Jerome N. Frank, Peter R. Nehemkis, Jr., John Howland, and Robert A. Hefner, Jr., all of Washington, D. C., and Green, Henry & Remmers, of St. Louis, *889 Mo., for Reconstruction Finance Corporation.
FARIS, Circuit Judge.
The Reconstruction Finance Corporation, to which reference may hereinafter be made by the use merely of the initials R. F. C., being a secured creditor of the debtor, heretofore filed a motion in this court, in effect averring that the debtor, through its then officers and board of directors, had on December 31, 1930, and prior to the commencement of this debtor's proceeding, made certain improvident and unlawful contracts with the Terminal Shares, Inc., and praying that an investigation be made thereof and the facts reported to the court, to the end that an order be entered requiring the trustees to disavow and rescind such contracts and to take such further legal steps as the facts and law touching recoupment should warrant.
This motion was, by an order of the court, referred to Marion C. Early, Esq., one of the regularly designated special masters of the Eighth Circuit and by this court appointed special master in this debtor's proceeding. This reference was had under the provisions of clause (9) of subdivision (c) of section 77 of the Bankrupt Act, as amended March 3, 1933, 47 Stat. 1474, 1476, wherein, it is provided that the judge "may on his own motion * * * refer any matters for consideration and report, either generally or upon specified issues, to one of several special masters," etc. Since the statute is broad in its terms, since it permits the judge to act on his own motion, since it includes "any matter," without modification or reservation, and since the reference may be either on general or special issues, it makes no earthly difference here that the R. F. C. neither asked for nor consented to this reference. Its status as a governmental agency confers on it no sacrosanct character, which puts it beyond the plain language of the statute, or which makes it obligatory to read into the statute conditions precedent not found therein. When the R. F. C. comes into court, it comes in on a parity with any other ordinary litigant and not otherwise.
The order of reference, among other things, provided that the special master should make and file a report showing:
"(a) The facts and circumstances with reference to the making and entering into of said contracts between the debtor and Terminal Shares, Inc.
"(b) The reasonableness of the consideration agreed to be paid by the Debtor under said contracts, and the reasonable prospective value to the Debtor of the subject matter of said contracts, in the light of the conditions then existing.
"(c) Any other pertinent facts bearing on the question as to whether or not said contracts are valid and legally binding contracts, or whether for any reason said contracts are voidable."
Much evidence was taken and returned by the special master, who, on February 14, 1935, filed a report, in which he considered the contentions made in the brief filed by R. F. C., and overruled them seriatim, save that contention that the burden was on Terminal Shares, Inc., to prove that the contracts in question were neither fraudulent, unfair, nor oppressive to the debtor; but the master finds that said contracts were executed in good faith, in accord with the resolution of the debtor's board of directors, and that the purchase price was such as that no profit accrued to the Terminal Shares, Inc. The above affirmative findings were made necessary (in view of the master's final conclusions and recommendations) by his antecedent finding, in effect that the Allegheny Corporation owned all of the stock of the Geneva Company, the optioning company, and all of the stock of the Terminal Shares, Inc., the selling company, as also a majority of the shares of the debtor, the buying company.
As I read the briefs of those who favor the sustaining of the report of the special master, it is not contended that at the time the resolution of December 18, 1930, was passed, as well as on December 30, 1930, when the final contracts of purchase between debtor and Terminal Shares, Inc., were executed, there was not what is commonly called an interlocking directorate existing between Allegheny Corporation, and debtor, for that O. P. Van Sweringen was then a large stockholder in and director of each company. Nor is it contended that Allegheny Corporation did not then bodily own and wholly control Terminal Shares, Inc. As I read the record, these facts are hardly in dispute, and were substantially admitted by Van Sweringen in his testimony. On the point the special master, very probably as giving only his *890 view of the law on the point, says this: "It is contended that the contracts in question are violative of Section 10 of the Clayton Act [15 U.S.C.A. § 20], and are therefore void. I find the evidence does not support the contention, and recommend that it be denied. (Citing cases.)"
Without taking up time to go further into the report, it is enough to repeat that, with the exception already noted, the finding was in favor of the sustaining of the purchase, so far as concerned attacks made on its validity, whether such attacks were bottomed on the law or the facts. Thereupon, the special master suggested and recommended that the trustees of the debtor disaffirm the contracts in controversy, "unless the purchase price be reduced to not exceeding fourteen million dollars as of the date of the contracts with interest and credits readjusted." (Italics supplied.)
To this report of the special master exceptions on many grounds were filed by R. F. C. And it is these exceptions, after a long hearing, a full argument, and after voluminous briefs have been filed, that constitute the matter in hand.
Since the controversy here does not presently involve the merits of these contracts, at least so far as concerns a solemn decree rescinding them and adjudging recoupment of moneys already paid, or per contra, it is not deemed necessary to go minutely into the many facts elicited in the hearing before the special master; for I have already set forth the matters and things submitted to him by the order which I quote above.
In 1929, the Allegheny Corporation, of which one the said O. P. Van Sweringen was a director, president, and large stockholder, obtained by stock purchases, or otherwise, a controlling interest in the debtor. About the same year it organized the Geneva Corporation of which said Van Sweringen was president, and perhaps still later it organized the Elfynhurst Company, the name of which was later changed to Terminal Shares, Inc. The Geneva and Terminal Shares aggregations were subsidiaries wholly owned and controlled by Allegheny Corporation. Some time in 1929 but prior to the stock market debacle in October, 1929, the Geneva Corporation acquired contracts, in the nature of options perhaps  though the precise nature is not now important  with the St. Joseph Stock Yards Company, (1) for all the capital stock of the St. Joseph Belt Railway Company, in consideration of the sum of $1,500,000; (2) with the Swift Family Realty Trust, and Armour & Co. of Delaware for two-thirds of the capital stock (the remaining one-third was and yet is owned by the Chicago, Burlington & Quincy Railway Company), of the North Kansas City Development Company (also certain notes of the last named); North Kansas City Bridge & Railroad Company (also certain notes of the last named), Kansas City Ferry Company, Parkside Land Company, Guinotte Land Company, North Kansas City Land & Improvement Association, all for the aggregate sum of $13,000,000; and (3) with the Union Terminal Trust (unincorporated and owned by Swifts), for all of the Capital Stock of the Union Terminal Railway Company of St. Joseph, Mo., for a consideration of $4,600,000.
The specific nature of these properties is largely indicated by the names of the corporations in which the stock and securities were to be acquired. The real estate interests to be acquired consisted of a two-thirds interest in some 1,900 acres of platted land in North Kansas City, and some 200 acres in Kansas City, Mo.; the latter bordering on the south bank of the Missouri river. This land seems to consist of lands suitable for railroad yards and tracks, lots for industrial sites, retail and wholesale business sites, and residential sites. In value these lands represented a very large part of the agreed purchase price of $13,000,000.
At some time between the dates of these contracts, to wit, October 16, 1929, and October 16, 1930, the Geneva Corporation assigned and transferred all of these several contracts to Terminal Shares, Inc., likewise, as said, a wholly owned subsidiary of Allegheny Corporation, and on the date last above, Terminal Shares, Inc., acquired full title from the several above-named sellers to all of the properties, stocks, and securities mentioned.
On December 18, 1930, a resolution was adopted by the board of directors of the debtor, authorizing the then president of the debtor to buy all of these properties from Terminal Shares, Inc., "at the approximate prices at which the properties were acquired by Terminal Shares, Inc." Thereafter and on December 31, 1930, Terminal Shares, Inc., and debtor entered into three separate contracts for the purchase by debtor of the properties named, for a total purchase price of $20,234,260, as also *891 a so-called fourth contract, called in the record a "cover-all contract." The above purchase price included interest on the sum paid by the Terminal Shares, Inc., from October 16, 1929, to December 31, 1930, at the rate of 5½ per cent. I omit any extended reference to a contingent agreement affecting a part of the lands and lots agreed to be sold, as not necessary to the present purpose.
I hardly deem it necessary to go minutely into all of the terms and conditions of these quite complicated contracts, inasmuch as the present purpose involves neither a final decree nor an accounting. It is perhaps enough to say that the debtor bound itself to pay the sum of $400,000 on the 1st day of March, 1931, and a similar sum quarterly, until January 1, 1936, when the whole balance of the purchase price should be payable. These quarterly payments, amounting annually to the sum of $1,600,000, were to be applied, first, to the payment of interest at the rate of 5½ per cent. annually, and, second, any balance was to be applied to the reduction of the principal. While any part of the whole debt remained unpaid, no possession was to be given to debtor of any part of the properties, nor at all, till January 1, 1936. Dividends, however, if any, were to be applied to reduction of the principal, in 1936, when the full purchase price should be paid on above date. The contracts required certain consents from public utility controlling bodies to be obtained, when and if such consents were required by law. If for any reason, the purchase price should not be paid by January, 1936, then the seller was given the power of selling all of said properties, on giving notice of such sale. This provision is seemingly not at all modified by the requirement that if the consent of any state controlling body or of the Interstate Commerce Commission shall be necessary, such consent shall be obtained. And under the strict letter of the contract it would seem that such a sale on default might be had, even though consent to the deal should be refused by said I. C. C. or any other utility controlling body. In passing, it may be said that no successful effort has ever been made, if any at all has been attempted, to obtain these consents although, prior to the beginning of the debtor's proceeding the debtor had paid to the seller the total sum of $3,200,000, in quarterly payments.
Many contentions are urged by exceptor, as reasons for the setting aside of the recommendations of the special master. Chief among these are the contentions: (a) That the contracts in question were grossly unfair and inequitable, for that they contain harsh provisions of forfeiture for conditions for which debtor is not responsible and which it has no power to avoid or remedy; (b) that as a corollary these contracts omit to provide adequate provisions for the protection of the debtor; (c) that these contracts (in part at least, and in so far as concerns the acquisition and holding of real estate and stock in real estate holding companies) are ultra vires; (d) that the purchase price agreed to be paid by debtor was exorbitant, and had the effect to saddle upon the debtor an immense loss already sustained by the seller, by reason of the great slump in the values of stocks and real estate, which occurred after Terminal Shares, Inc., bought the properties in October, 1929, and before it sold them to the debtor in December, 1930; and (e) that these contracts are on the undisputed basic facts, forbidden by section 10 of the Act of October 15, 1914, now section 20, title 15, U.S.C. (15 U.S. C.A. § 20) (commonly called the Clayton Act). There are other contentions, or, at least, other species of the above genuses.
I am constrained to the view that each and every of the above contentions should have been sustained, if made, and some of them were made, before the special master.
I think it is clear that so much of these contracts as purported to sell to the debtor real estate suitable only, and intended only, for industrial, business, and residential purposes, or to be more exact, stock in corporations holding and dealing in such properties, was plainly, so far as the debtor is concerned, ultra vires of its powers. A railroad corporation may acquire and hold properties of whatever sort when such are necessary for the operation of its business of transporting freight and passengers, express, or the mails. It may acquire and hold real estate for tracks, side tracks, switches, offices, freight warehouses, bridges, ferry landings, depots, and terminals; in short, for every common carrier need. It may, looking to future needs, acquire and lawfully hold more than it presently needs for the above purposes. And the question of what is necessary to the maintenance and operation of a railroad is a question of law to be decided by the courts. It is not a question to be arbitrarily decided by the railroad upon some such farfetched *892 theory, that if it shall buy and set up, own, or operate wheat fields, commercial mines, orchards, industrial concerns, and factories along its lines, it shall be able to create and monopolize traffic and thus add to its earnings as a common carrier. Obviously, such a theory, if pursued to its last analysis, would result in the ownership and operation by a railroad of all industries along, or reasonably accessible to, its lines. Surely no such result was ever contemplated by the legislative body when granting either special or general charters to railroads in this state. Cf. sections 4654, 4655, 4659, and 4660, R.S.Mo.1929 (Mo.St. Ann. §§ 4654, 4655, 4659, 4660, pp. 2070, 2072, 2079); section 1, title 49, U.S.C. (49 U.S.C.A. § 1). But a railroad corporation in Missouri cannot own and hold real estate for speculative purposes. Pacific R. Co. v. Seely, 45 Mo. 212, 100 Am.Dec. 369. A corporation, and a railroad is no exception to the rule, can lawfully exercise such powers and such powers only as are conferred on it by its charter. Hamburg Bank v. Ouachita Bank (C.C.A.) 78 F.(2d) 100.
Again, I cannot avoid the conclusion that section 10 of the Clayton Act (now section 20, title 15, U.S.C. [15 U.S.C.A. § 20]) positively forbade the sale contracts herein sought to be upheld. This section, so far as it is pertinent, reads thus: "No common carrier engaged in commerce shall have any dealings in securities, supplies or other articles of commerce, or shall make or have any contracts for construction or maintenance of any kind, to the amount of more than $50,000, in the aggregate, in any one year, with another corporation, firm, partnership or association when the said common carrier shall have upon its board of directors or as its president, manager or as its purchasing or selling officer, or agent in the particular transaction, any person who is at the same time a director, manager, or purchasing or selling officer of, or who has any substantial interest in, such other corporation, firm, partnership or association, unless and except such purchases shall be made from, or such dealings shall be with, the bidder whose bid is the most favorable to such common carrier, to be ascertained by competitive bidding under regulations to be prescribed by rule or otherwise by the Interstate Commerce Commission."
Here was a fairly plain case of so-called interlocking directorates. In fact, the concession of counsel that the burden of proof to show good faith rests on Terminal Shares, Inc., seems to me to constitute a tacit admission of a fiduciary relation brought about by such a directorate. Section 10, supra, deals with at least three subjects: First, securities, which include, of course, shares of capital stock, such as were here largely and except certain notes, all that was primarily dealt in; second, supplies, or other articles of commerce; and, third, contracts for construction and maintenance, when the amount of the latter shall exceed $50,000, in any one year. It seems clear that the proviso as to bids applies alone to the second and third classes, for ordinarily there can be no monopoly in these, which will preclude bidding. No one, ordinarily, can corner all ties or rails, or cars, or locomotives; nor will it ever occur that there is but one concern engaged in railroad building or maintenance. So, in classes 2 and 3, supra, competitive bidding is possible. Such bidding is ordinarily impossible when the subject-matter consists of shares of capital stock in other corporations. In such case the Congress had in mind to forbid dealing in such, so long as the interlocking directorates, banned in section 10, supra, should exist. It is too plain to require exposition, that any other view would render the provisions of section 10, relating to securities, absolute nullities; for to me it is plain that the Congress intended to stop a practice among railroads and their exploiters and manipulators, which has had much to do with making the financial history of railroads the most indecent and sordid chapter ever written in the history of this or any other nation. While section 10, supra, has never been construed, so far as I know, for counsel have cited no cases construing it, nor have I found any, to me as said its meaning seems clear. Counsel for the debtor contend that the proviso as to competitive bids covers securities, and that if in the very nature of the situation bidding for the sale of securities is not possible  and they insist it was not here possible  then the statute has no application, and one corporation may freely buy securities from another regardless of interlocking directorates and regardless of the statute. To my mind such a construction utterly destroys the beneficent intention held in mind by Congress when it passed the Clayton Act, of which section 10 is a part. As forecast, I think it rather clearly provides that when interlocking directorates exist between a railroad which is engaged *893 in interstate commerce, and another railroad, or corporation, then unless competitive bids are obtained, such corporations are forbidden to deal with each other. And if, as already said, in the situation existing here, no competitive bids are possible, then the statute forbids the deal absolutely. If this is not what Congress intended, then Congress did a vain and futile act when it enacted the statute, so far as concerns the control of the buying and selling of securities, and as is known by all men such buying and selling has long constituted a crying financial evil in railroad annals.
As I read the special master's report and findings of fact, he concludes that if control value, i. e., future traffic value and traffic protection value are taken into account, the properties herein dealt with were fully worth the purchase price agreed to be paid therefor by the debtor. I need not consider whether or not the finding thus made is, or is not, in tacit conflict with the conclusion reached that as a condition precedent to confirmation of these contracts by the trustees, the price should be reduced to $14,000,000. Clearly such control value is largely speculative and does not wholly connote present worth or value. Because it depends for its realization upon a linked chain of speculation to the effect that the ownership of the commercial sites, for example, shall enable the debtor to locate industrial concerns thereon, that these concerns shall furnish traffic, that this traffic shall go to the debtor, by reason of its ability to exclude other common carriers therefrom, and so such traffic shall wholly be controlled and handled by the debtor, and its revenue be thus largely increased. Evidence as to the present worth, or value, of the properties involved differed widely, and it is not capable of reconciliation. I am impressed with the fact that largely those witnesses who fixed the higher values were by employment and affiliation liable to be more interested than were the witnesses who gave the lower figures. Value is I think always a matter of opinion, and opinion is often unintentionally colored by interest.
So, I am of opinion, without further discussion, exposition, or argument, that the contracts in question were improvident, unfair, unlawful, and overreaching, that, in part at least, they constituted acts ultra vires of a Missouri Corporation, that they were in contravention of section 10, supra, of the Clayton Act, and that they and each of them should be disaffirmed by the trustees, and that such legal steps, as the trustees are advised to be proper, should be taken to recover from the seller the moneys already paid by the debtor. An order may be presented for settlement in accord with these conclusions, and counsel may, if they desire, proffer in twenty days findings of fact and conclusions of law in accord with the views I have hurriedly and briefly expressed. Costs, I think, should be paid by the trustees out of the funds of the debtor in their hands.