CHICAGO, B. & Q. R. CO. v. NORTH KANSAS CITY DEVELOPMENT CO. et al.

NORTH KANSAS CITY DEVELOPMENT CO. et al. v. CHICAGO, B. & Q. R. CO. et al.

No. 12243.

Circuit Court of Appeals, Eighth Circuit.

March 2, 1943.

Andrew C. Scott, of Chicago, Ill. (John L. Rice, of Denver, Colo., William S. Hogsett and Hale Houts, both of Kansas City, Mo., and Raymond E. Skov, J. C. James, Walter McFarland, and Eldon Martin, all of Chicago, Ill., on the brief), for Chicago, B. & Q. R. Co.

Godfrey Goldmark, of New York City, and Henry N. Ess, of Kansas City, Mo. (Elton L. Marshall and Paul Barnett, both of Kansas City, Mo., and Max Freund, of New York City, on the brief), for North Kansas City Development Company and others.

Before SANBORN, THOMAS, and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

The Burlington Railroad sought to condemn,[1] for railroad purposes, 19 separate right-of-way strips, each about 17 feet in width, totalling 18.86 acres, and the 10.8 miles of lead tracks and 94 switch turnouts constructed thereon, constituting the middle

---

[1] The proceedings were instituted in federal court on the ground of diversity of citizenship.

portion of some 40-foot alley-ways in the North Kansas City Industrial District of North Kansas City, Clay County, Missouri, and connecting with the shipping sidings for approximately 100 industrial plants located in the district.

The North Kansas City Development Company held record title to practically all of the strips sought to be condemned. Title to .30 of an acre stood in the name of the North Kansas City Bridge and Railroad Company, a kindred corporation, and three additional small tracts stood in the names of other parties. All of the record owners were made parties defendant, but further reference to such parties, except the Development Company and the Bridge Company, is unnecessary in disposing of the controlling questions here presented.

The Development Company and the Bridge Company challenged the Burlington's right to condemn, on the grounds that the property already was legally dedicated and being devoted to the same public use for which the Burlington was seeking to acquire it, and that the Burlington was estopped, by previous recognition and conduct, from asserting otherwise. A preliminary trial was held on these foundational questions, and the court adjudged that, under the Missouri statutes, the Burlington was legally entitled to make the condemnation. Commissioners were appointed to assess the amount of the damages, and the Burlington thereafter filed exceptions to the report which they returned. The court thereupon granted a jury trial on the issue of damages, pursuant to section 1508, Mo.Rev.St.1939, Mo. R.S.A. § 1508, and the jury returned a verdict against the Burlington in the amount of $835,000.

From the judgment entered on the verdict, the Burlington has appealed, alleging errors of law in the admission of evidence and, in the giving and refusing of instructions. The Development Company and the Bridge Company have cross-appealed from the adjudication of the Burlington's right to condemn. In the logical treatment of the questions thus requiring consideration here, the issues raised by the cross-appeal of the Development Company and the Bridge Company will be first discussed.

### Right to Condemn.

Under section 1504, Mo.Rev.St. 1939, Mo.R.S.A. § 1504, a railroad is given the usual general power to condemn for railroad purposes. Section 1512 of these statutes provides, however, that, "In case the lands sought to be appropriated are held by any corporation, the right to appropriate the same * * * shall be limited to such use as shall not materially interfere with the uses to which, by law, the corporation holding the same is authorized to put said lands." Under the Missouri decisions, the word "corporation" in this section must be taken to mean public service corporation; the word "uses" to mean public uses; and the term "by law * * * authorized" to mean authorized by corporate charter, consisting of the applicable incorporation statutes and the specific articles of association. Kansas & Texas Coal Ry. Co. v. Northwestern Coal & Mining Co., 161 Mo. 288, 320–321, 323, 61 S.W. 684, 691, 692, 51 L.R.A. 936, 84 Am.St.Rep. 717. See, also, Mo.Const. art. 12, § 7, Mo.R. S.A.; Orpheum Theater & Realty Co. v. Seavey & Flarsheim Brokerage Co., 197 Mo. App. 661, 199 S.W. 257; Hoagland v. Hannibal & St. J. R. Co., 39 Mo. 451, 459; In re Missouri Pacific R. Co., D.C.E.D.Mo., 13 F.Supp. 888, 892.

The test of the Burlington's right to make the condemnation in the present situation, under the statutes and the decisions cited, was, therefore, whether or not the property already was being devoted to railroad use by another corporation which had the power and the right, under the statutes and under its articles, to engage in such operations.

The North Kansas City Industrial District was a privately platted real estate project, begun by the Development Company in 1903. The Development Company was a real estate corporation and had no charter power to engage in public railroad operations. In order to promote the sale of its industrial sites, however, it entered into an undertaking, in all its land sale contracts, to construct, operate and maintain, or to cause to be constructed, operated and maintained, in the alleys at the rear of the sites which it sold, suitable railroad lead, turnout and switch track facilities,[2]

---

[2] Only the lead tracks and turnout facilities are involved in this proceeding. The Burlington says in its brief that the sidings or switch tracks for the various industries were excluded from the condemnation, for the reason that its maintenance of these sidings would constitute an unlawful discrimination as

to serve the locating industries. The 19 lead tracks here involved had been built from time to time, commencing in 1912, as industrial sites were disposed of, in fulfillment of this obligation in the Development Company's contracts.

It is clear, under Missouri law, that, if the Development Company was the owner and operator of the facilities, there can be no room to contend that they had been constructed and were being maintained by a public service corporation having the power and right to do so under the statutes and under its articles, and that they thus legally had become so dedicated to a public use that they could not properly be made the subject of condemnation for similar railroad purposes. But the Development Company and the Bridge Company seek to avoid this situation by alleging in their pleadings and contending here that the tracks were in fact constructed by the Bridge Company, upon the land of the Development Company, with its consent, and were owned and being maintained by the Bridge Company, and that that corporation had such charter powers as legally enabled it to make a dedication of the property to public railroad use and as would therefore preclude the Burlington from appropriating the facilities.

The Bridge Company had been incorporated in 1901, under the Missouri railroad and union depot company statutes, Mo. Rev.St.1899, ch. 12, art. 2, Mo.R.S.A. § 5126 et seq., to construct and operate a railroad between described points in Missouri; to construct and operate a toll and railroad bridge across the Missouri River at Kansas City, Missouri; to construct and operate "a union station for passenger or freight depots, or both," in the city of Kansas City, Missouri, and in any other city of the state; and "to build, maintain and operate terminal railroads and terminal facilities to be used in connection with such union depot or station". Mo.Rev.St.1899, §§ 1164, 1165, Mo.R.S.A. §§ 5251, 5252.

The Bridge Company and the Development Company were kindred corporations, as has been indicated, having the same stockholder interests, officers and office employees. The record shows that the tracks involved had been constructed with funds supplied by the Development Company and on checks issued by it in direct payment of all materials and labor, but the amounts thereof had been charged on its books against the Bridge Company, and the officers had caused the sums to be set up on the records of both corporations as capital expenditures of the Bridge Company. The Burlington contends that these bookkeeping entries were mere paper formalities and that the Development Company was simply using the name of the Bridge Company as a cloak for its own activities, but there is evidence indicating also that, in previous relationships with the Bridge Company and the Development Company, the Burlington had, to some extent at least, recognized ownership of the facilities as being in the Bridge Company.

The trial court found that the tracks had in fact been constructed by and were the property of the Development Company and not the Bridge Company, but it did not rest its decision as to the Burlington's right to condemn upon this narrow ground. Further discussion of the issue and of the evidence in connection with it is unnecessary here, because, under the other circumstances in the record, even if the tracks were owned and maintained by the Bridge Company, that fact would not be sufficient to preclude the Burlington from condemning them, under section 1512 of the statutes. On the undisputed evidence, the Bridge Company had forfeited any power, which it could possibly claim to have had under its charter, to construct, operate and make a valid dedication of the property for public railroad use, and hence the facilities were not exempt from condemnation.

The State of Missouri, as part of its public policy, has imposed a rigid limitation upon the time within which a railroad company must complete the special undertakings of its charter and has made a failure to do so operate automatically, in the public interest, as an absolute forfeiture of all of the unexercised railroad powers of the corporation's charter, except such as may be necessary and incident to the holding and maintaining, for public service, of the facilities previously constructed and validly placed in operation prior to the forfeiture.

By express statute, Mo.Rev.St.1899, § 1161, Mo.R.S.A. § 5248, the legislature has provided that, "If any corporation formed under this article shall not, within two years after its articles of association are filed

---

against other shippers, under the provisions of the Elkins Act of February 19, 1903, 32 Stat. 847, as amended, 34 Stat. 587, 49 U.S.C.A. § 41 et seq.

and recorded in the office of the secretary of state, begin the construction of its road, and shall not within one year thereafter expend thereon not less than ten per cent on the amount of its capital, or shall not finish its road and put it in operation in ten years from the time of filing its articles of association as aforesaid, its corporate existence and powers shall cease: Provided, that if a portion of its road shall be finished and in operation, it shall continue its corporate existence, with power to hold and manage the portion of its road so constructed, and for no other purpose."

 The Missouri courts have held that the general rule that "a corporation, by omitting to perform a duty imposed by its charter, does not ipso facto cease to be a corporation, but simply exposes itself to the hazard of being deprived of its corporate character and franchises by the judgment of the court in a proceeding against it by quo warranto on the part of the state", has no application to the specific obligations and limitations imposed upon a railroad company by this statute. Ford v. Kansas City & I. Short Line R. Co., 52 Mo.App. 439, 454–457; Kansas City Interurban R. Co. v. Davis, 197 Mo. 669, 676, 95 S.W. 881, 882, 114 Am.St.Rep. 790; Collins v. Martin, Mo.Sup., 248 S.W. 941, 947. The statute is self-executing and no judicial declaration is required to effect the forfeiture, whether it be total or partial, so that the failure of a railroad corporation to complete the special undertakings of its charter, in ten years, automatically divests it of its general railroad rights and powers, except those, as we have indicated above, which may be necessary to enable it to continue the public use of such facilities and property as it has actually constructed under its charter and placed

in operation within that period. Since the corporation in such a situation is ipso facto stripped of the power to engage in any of its uncompleted charter undertakings, it necessarily follows that any property which it thereafter attempts to acquire for the purpose of carrying on such other operations cannot be, regarded as being legally dedicated and devoted to an authorized railroad use, which will prevent it and any facilities constructed upon it from being subject to condemnation by another railroad company for a similar use.

In Kansas City Interurban R. Co. v. Davis, 197 Mo. 669, 676, 677, 95 S.W. 881, 882, 883, 114 Am.St.Rep. 790, the court said: "Section 1161, Rev.St.1899 [Mo.R.S.A. § 5248], declares that, if the company does not begin the work of construction within two years and finish it within 10 years, it shall forfeit its. corporate existence and its powers shall cease. Then follows a proviso that, if the company has in the meantime built a portion of its road, it may retain and operate that portion. That proviso comes only as a modification of the forfeiture prescribed in the main body of the section. It * * * operates only when the condition of forfeiture has occurred, and when without it all corporate rights would cease and the property become forfeited. It is not an authority to proceed to construct, but a permission to hold that which has already been constructed, and which but for the proviso would be forfeited."

In this case, the only one of the special undertakings described in the Bridge Company's articles, upon which it began construction within ten years, was the toll and railroad bridge across the Missouri River at Kansas City, Missouri.[3] The bridge was a double-deck structure, which was opened

---

[3] The record shows that the Bridge Company did not itself undertake any construction work on the bridge until 1909, which was eight years after its incorporation. The Burlington contends that, since the Bridge Company thus failed to begin construction of any of the special undertakings of its charter within two years after its incorporation, it completely forfeited its corporate powers and existence at that time, under Mo.R.S.A. § 5248, quoted in the opinion. There is other evidence in the record, however, which is not fully developed, indicating that shortly after its incorporation the Bridge Company purchased some piers which another company previously had constructed in the river, and, on them, later completed its bridge. Since neither the bridge nor any other property which the Bridge Company purports to hold, except the 19 lead tracks and turnouts, is here sought to be condemned, there is no occasion for us to consider the question of the Bridge Company's corporate existence in relation to the bridge or such other property, because the lead tracks and turnouts cannot in any event be claimed to have been constructed as one of the Bridge Company's charter undertakings within ten years, and the Burlington's right to condemn is sufficiently clear on this ground, as is fully developed in the opinion. We shall therefore not engage

for pedestrian and vehicular traffic in 1912. The deck intended for railroad purposes, however, was never so used until 1920. At that time the Bridge Company entered into a lease with the Missouri Pacific Railroad Company, allowing it to connect its tracks to the bridge and to operate its trains across it. The Bridge Company never purported to use the bridge for any railroad operations of its own, for it had never, during any of the forty years since its incorporation, owned or leased a single engine, freight car or other piece of railroad stock, and the Missouri Pacific's use of the bridge as part of its own operating system was not in the present situation a fulfillment of any of the other railroad service undertakings in the Bridge Company's charter. The construction and operation of the bridge are in any event without significance or relationship to the industrial track facilities, for, during the thirty years that the bridge has been in existence, it has never been used as a part of or in connection with any of these tracks.

Of the other special undertakings in its charter, the Bridge Company never at any time attempted to construct the railroad line described in its articles. It had never undertaken to build "a union station for passenger or freight depots, or both", in Kansas City, Missouri, or in any other city of the state. It had never undertaken to "build, maintain and operate terminal railroads and terminal facilities to be used in connection with such union depot or station". The Bridge Company argues that the lead tracks were intended to be part of a general freight depot or terminal, which it hoped some day to complete. But forty

years had elapsed since the Bridge Company's incorporation, and no freight depot or terminal had ever been constructed. The lead and turnout facilities were still and had always been mere isolated tracks, connected only to the main lines of the Burlington, which lay adjacent to the industrial district, and the Burlington alone had carried on the switching operations to and from the various plants by an arrangement with the Development Company and the Bridge Company from the time the industrial development began.[4]

■ We think the charter power of the Bridge Company to construct an independent freight depot or terminal in Kansas City, Missouri, had ipso facto been forfeited in 1911, and, since the lead tracks and turnout facilities were all constructed subsequent to that time, they could not have become legally dedicated to a public use as part of this special undertaking in the Bridge Company's charter so as to be exempt from condemnation. Nor could they be claimed to be exempt as constituting an auxiliary or collateral incident in the necessary maintenance of any other railroad or union depot service which the Bridge Company had properly undertaken under its charter within the original ten year period.

The Development Company and the Bridge Company argue that the power in the charter to construct "a union station for passenger or freight depots, or both", in the city of Kansas City, Missouri, and to build and operate terminal facilities in connection therewith, should be held not to be subject to the forfeiture statute, since the power was derived, not from the railroad

in any discussion of whether the Bridge Company's corporate existence was wholly forfeited at the end of two years or whether the acquisition of the bridge piers was tantamount to the commencement of construction within that period of the bridge undertaking of its charter.

[4] When the development of the industrial district was first begun, the owners of the Development Company and the Bridge Company sought to interest the Burlington in the project, in order to obtain railroad service to and from the plants. The Burlington purchased one-third of the capital stock of the two companies and of some of their kindred corporations. From 1912 to 1921, the Burlington was allowed free use of the lead tracks, which were laid to serve the various locating industries as plant sites were sold or leased. Commencing in 1921,

the Burlington agreed with the Development Company and the Bridge Company to pay $1.00 for each car of freight that it switched into or out of the district, as rental for the use of the lead track facilities. This arrangement continued down to the time of the trial in this case, although it was subject to cancellation by either party on 90 days notice. The present condemnation was prompted by the fact that the parties who owned the other two-thirds stock interest in the Development Company and the Bridge Company had sold their stock to other parties who were antagonistic to the Burlington and were seeking to work out some way of enabling the Missouri Pacific to invade the district. In re Missouri Pacific R. Co., D.C.E.D.Mo., 13 F. Supp. 888, sets out some of the history of the situation.

incorporation statutes, of which the forfeiture section is a part, but from the provisions relating to union depot companies, which were originally a separate legislative act and which contained no forfeiture provision. This argument would seem to constitute a departure from the theory of the pleadings and of the trial before the district court, but even on its merits it could not change the result here.

The original railroad incorporation statute was enacted in 1853, Laws 1853, p. 121 et seq., while the union depot company statute was first enacted in 1871, Laws 1871, p. 59. In the general revision and compilation of the Missouri statutes made in 1872, c. 67, art. 2, § 1 et seq., the provisions of the union depot company act were included in the chapter and article on railroad incorporations. Wagner's St. p. 315a, c. 67, art. 2, § 61 et seq. It is contended here, and probably is correct, that this circumstance alone did not in any way change the legal significance or effect of the union depot company act. But it further appears that subsequent to the revision and compilation of 1872, the legislature in 1879, by specific act, rewrote and re-enacted all of the provisions governing the incorporation of both railroad companies and union depot companies into the same statutory chapter; caused the sections relating to union depot companies to precede the general forfeiture provision in position; and allowed the forfeiture to apply by its terms to "any corporation formed under this act". See original rolls of Mo. Session Laws of 1879, p. 129 et seq., Act approved May 31, 1879.[5] In 1899, the legislature again revised two of the union depot company sections as part of the general article relating to railroad companies, as it then appeared in the statutes, and replaced the new sections as incorporated parts of the article. See Mo. Session Laws of 1899, p. 124, Mo.R.S.A. §§ 5251, 5252. When the public purpose intended to be served by the forfeiture provision is considered, together with the language used, this twice-taken action of the legislature, in incorporating the union depot sections into the railroad article, seems to us to require that the powers of a union depot company be held to be subject to the same forfeiture as those of a railroad company generally. Compare Turner v. Missouri-Kansas-Texas R. Co., 346 Mo. 28, 35, 142 S.W.2d 455, 458, 129 A.L.R. 829; Corley v. Montgomery, 226 Mo.App. 795, 803, 804, 46 S.W.2d 283, 287. Certainly, from a public interest standpoint, there would seem to be as much legislative reason for summarily laying at rest the powers of a union depot company, possessed of the same privilege of eminent domain, as in the case of a railroad company, with respect to any of the special undertakings of its charter which it did not fulfill in the time and manner prescribed by the forfeiture statute.

We accordingly hold that the forfeiture provisions of section 5248, Mo.R.S.A., are applicable to a union depot company, and that the term "road" as used in that section is intended as a generic reference to all of the special undertakings in the charter of either a railroad company or a union depot company or a hybrid combination of both.

But, even if the construction of section 5248, Mo.R.S.A., contended for by the Development Company and the Bridge Company had been correct, this would not have saved the lead tracks and turnouts from condemnation here. The fact they had been maintained for thirty years as isolated industrial tracks clearly entitled them to be considered, as the trial court did, for purposes of this case, as mere independent facilities for railroad switching operations and not as union depot incidents or adjuncts. Insofar as the operations could be contended to have been those of the Bridge Company, or if the Bridge Company had in fact undertaken to carry on the switching operations directly, they necessarily would have to be regarded here as the activities of an independent terminal or switching railroad. But the Bridge Company had no power under its articles to engage in terminal railroad operations, except as a part of and in connection with the union depot undertaking of its charter. Further than this, any power to operate a terminal railroad apart from a union station or depot clearly would rest upon the general railroad company statutes and would be specifically subject to the forfeiture provision. Compare Clark v. Atchison, T. & S. F. R. Co., 319 Mo. 865, 874, 875, 6 S.W.2d 954, 958. If the Bridge Company

---

[5] This Act for some unexplained reason appears not to have been published in the printed Session Laws, but no question seems to exist as to the regularity of its enactment, signing and approval, and it is duly filed in the office of the Secretary of State.

had had any power under its charter to operate an independent terminal railroad in the North Kansas City Industrial District, apart from any union depot undertaking in the city of Kansas City, that power was not exercised within a ten year period. Hence, under any view that might be sought to be taken of the Bridge Company's corporate status and powers, the facilities here involved would not have become legally dedicated to public use under the company's charter, so as to exempt them from condemnation.

The Development Company and the Bridge Company further contend, however, that, even if the lead tracks and facilities were not validly dedicated to public use as a matter of charter power and undertaking, they had become impressed with a public trust under the Public Service Commission Act of 1913, Mo. Session Laws 1913, p. 557, Mo.R.S.A. ch. 35, and for that reason could not be subjected to condemnation. State ex rel. Public Service Commission v. Missouri Southern R. Co., 279 Mo. 455, 214 S.W. 381, is cited in support of the proposition that once a public service corporation has put property to a public use, it cannot thereafter discontinue such use without the consent of the Public Service Commission, even though the activity is unauthorized by its charter. But we do not read that decision or the Public Service Commission Law to mean that the property thereby becomes dedicated to public use in such a sense as to exempt it from the operation of the condemnation statute. Section 1512, Mo.R.S.A., as we have already pointed out, prohibits condemnation by a railroad company of property of another public service corporation only as against such activities and uses as are authorized by the latter's corporate charter. See St. Louis, H. & K. C. R. Co. v. Hannibal Union Depot Co., 125 Mo. 82, 92, 93, 28 S.W. 483, 485.

A railroad company or a union depot company, which is using property to engage in activities beyond its charter powers, either as originally limited or as subsequently forfeited, cannot, therefore, claim the right to hold such property as against the condemnation of another railroad company, having the power under its charter validly to engage in such activities and seeking to acquire the property for that purpose. The condemnation statute contemplates that the public interest—which, of course, also is intended to be furthered

in requiring that a public service corporation must make application to the Public Service Commission for leave to discontinue any public use of property, whether such use is authorized by its charter or not—can best be served in any event by allowing the property to be acquired for the same use by another corporation which has the specific power and obligation under its charter to make a legal and permanent dedication of it. In this, there is no conflict with State ex rel. Public Service Commission v. Missouri Southern R. Co., supra, or the Public Service Commission Law. And so, the Bridge Company can not contend here that its unauthorized activities have acquired a legal sanction to defeat the operation of the condemnation statute.

The contention also is made that the Burlington is estopped by past dealings and previous recognition from asserting that the Bridge Company has no legal authority to own or operate the facilities involved. But this is merely an attempt to argue that an exercise of the power of condemnation for public purposes may be subject to a private estoppel. The rule is well settled in Missouri, as it is generally, that, since the power of condemnation is granted in the public interest, there can be no estoppel against its exercise from any private actions between the condemnor and the condemnee. Chicago, B. & Q. R. Co. v. McCooey, 273 Mo. 29, 200 S.W. 59, 64, 65; City of Moberly v. Hogan, 317 Mo. 1225, 1230, 298 S.W. 237, 239; Georgia v. City of Chattanooga, 264 U.S. 472, 44 S.Ct. 369, 68 L.Ed. 796; Nichols, Eminent Domain, 2d Ed., pp. 75–79; Lewis, Eminent Domain, 3rd Ed., p. 737.

Finally, the Development Company and the Bridge Company argue that corporate powers and authority cannot be collaterally attacked. The authorities cited in support of this general proposition have no application to the present situation. As we have already pointed out, the forfeiture of a railroad company's charter or of any of its charter powers, under section 5248, Mo.R.S.A., is self-executing. Beyond this, whether land has been legally dedicated to a public use is, under section 1512, Mo.R.S. A., always a matter for direct inquiry in a condemnation proceeding, and the question of collateral attack upon corporate powers or authority is not involved.

The Burlington has filed a motion to dismiss the cross-appeal of the Bridge

Company, on the ground that it was not taken within three months from the date of the preliminary adjudication of the Burlington's right to condemn, but only within three months from the date of the judgment entered on the jury's verdict. On the record before us, we do not regard the Bridge Company's rights as having been finally and completely disposed of until the entry of judgment on the jury's verdict, nor were they treated by the trial court or by the Burlington itself at the time as having been so. The motion to dismiss is denied, without further discussion.

On the grounds and to the extent that has been indicated herein, the trial court's adjudication of the Burlington's right to condemn is affirmed.

### Errors on Trial of Damages.

The Burlington's appeal from the judgment on the jury's verdict goes largely to the propriety of certain evidence of market value admitted by the trial court, some of which rested upon a capitalization of the reasonable rental value of the property for the switching use and privileges involved, as testified to by an expert, instead of upon the amount of rent fixed in the Burlington's lease, and a further part of which rested upon a capitalization of the general traffic revenue and estimated profit of the Burlington from the freight hauled over its 9,000-mile railroad system, that had gone out of or in to the industrial district.

The Burlington contends that any attempt to show a reasonable rental value for the property different from that prescribed by the existing lease, as a basis for demonstrating and computing market value through capitalization of inherent earning power, was speculative and incompetent, and that such evidence should have been excluded. There is no Missouri decision that compels such a limitative holding, and we are unable to agree with the contention.

■■■ Where property in condemnation has been leased for a particular use, evidence of what the owner can fairly and reasonably receive as rental return for such use, even though this amount differs from the rental fixed in the existing lease, is proper as a possible capitalization factor to assist in the determination of actual market value. For capitalization purposes, neither the condemnee nor the condemnor should be bound by the rental of an unreasonable or improvident lease. Compare McKinney v. Mayor, etc., of Nashville,

102 Tenn. 131, 52 S.W. 781, 73 Am.St.Rep. 859; Brunswick & T. Water District v. Maine Water Co., 99 Me. 371, 59 A. 537; Citizens' Savings Bank & Trust Co. v. Fitchburg Mutual Fire Ins. Co., 87 Vt. 23, 86 A. 1056; Northern Pacific R. Co. v. North American Telegraph Co., 8 Cir., 230 F. 347, L.R.A.1916E, 572. If the present lease had been an unreasonable or improvident one on the part of the Burlington, the rule for which it contends would equally have prevented it from showing that fact in attempting to meet any evidence of value based on a capitalization of the fixed rental. In any situation where it is sought to use rental return as a capitalization factor to assist in arriving at the market value of condemned property, both parties will have to rely upon the common sense of the jury to weigh the opposing force of any general evidence of reasonable rental value against the facts and circumstances of an existing lease.

The contention that it was error to admit evidence of market value based upon a capitalization of estimated profits from the line-haul of freight moving out of or in to the industrial district requires consideration generally and also in relation to its attempted application to the Burlington's particular situation and system operations. The Burlington argues first that, since neither the Development Company nor the Bridge Company had the power to carry on railroad operations, and since neither owned a general railroad system, the traffic revenue that a railroad company acquiring property might derive from the line-haul of freight out of or in to the industrial district over its railroad system could only constitute value to the taker and not loss to the owner. It further argues that in any event a traffic-value capitalization of the condemned property could not competently be computed by applying the Burlington's average profit per car on the total freight hauled over its 9,000-mile system, to any freight-haul derived from the industrial district by virtue of its operation of the switching facilities, as was attempted to be done by some of the expert witnesses for the condemnee.

■■■ The general principle is, of course, well established that just compensation in condemnation must be measured by the owner's loss and not by the taker's gain. See United States v. Miller, 63 S.Ct. 276, 280, 87 L.Ed. ——; Olson v. United States, 292 U.S. 246, 254-256, 54 S.Ct. 704, 78

L.Ed. 1236; The Minnesota Rate Cases (Simpson v. Shepard), 230 U.S. 352, 450-452, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A., N.S., 1151, Ann.Cas.1916A, 18; Boston Chamber of Commerce v. City of Boston, 217 U.S. 189, 195, 30 S.Ct. 459, 54 L.Ed. 725. The Missouri Supreme Court has on several occasions emphasized: "The market value is not to be determined by the value of the strip in question to the plaintiff, or the plaintiff's necessity of acquiring it. This consideration must in no way be allowed to affect the determination by the jury of the value of either the whole property or of the strip sought to be appropriated by the plaintiff in this proceeding." St. Louis, K. & N. W. R. Co. v. St. Louis Union Stock-Yards Co., 120 Mo. 541, 25 S.W. 399, 402; St. Louis, K. & N. W. R. Co. v. Knapp, Stout & Co., 160 Mo. 396, 61 S.W. 300, 302; Metropolitan St. R. Co. v. Walsh, 197 Mo. 392, 94 S.W. 860, 862.

 But due recognition of this rule does not require the conclusion here that it was wholly incompetent to receive any evidence as to the amount of existing freight traffic which it could be shown with reasonable certainty that any railroad, in a position to handle it, would proximately receive from the industrial district by virtue of its ownership and operation of the established switching facilities therefor. The property, as has been pointed out, was being used and was sought to be acquired for railroad traffic purposes connected with the district. Any general control of existing freight-haul traffic that would result from ownership and operation of the established switching facilities for the district might well constitute a sound factor in its market value as railroad property. While the present condemnee may not have received or be in a position to derive any freight revenue as such out of this traffic control (except as it may have been made a factor in any lease rental), the control would still in a sufficient sense represent railroad value inhering in the property. Such a piece of property could reasonably be expected, by virtue of this circumstance, to have a higher market value in the railroad world than would corresponding right-of-way strips and track facilities not constituting a part of the industrial district and not controlling any existing traffic, or, as the condemnee's brief expresses it, "if it were located in the Mojave Desert with no traffic."

 But, while proof of traffic control generally was admissible, as bearing on market value, whether such control could competently be translated into a specific capitalization before a jury, and, if so, what should be the nature and scope of the evidence received to measure its volume and return, present more difficult questions. In view of the peculiar nature of the property and the purpose which it was serving, we think capitalization evidence could properly be received, where, as here, it was made to appear that traffic control and probable revenue therefrom would be factors of value consideration in the purchase of such a piece of property in the railroad world. Since, however, one railroad could not be made to pay a higher condemnation value than another, such capitalization evidence, to be competent, necessarily would have to have a general basis. It could not rest upon premises that would merely individualize some result against the condemnor.

The extent of the traffic control involved, therefore, for capitalization purposes, could only soundly be measured by the volume that with reasonable certainty would proximately follow ownership of the property into the hands of a railroad company generally. The attempt to evaluate such control in terms of net traffic revenues, for capitalization purposes, would similarly have to rest upon a general basis. Obviously, the amount of net revenue which a particular railroad had derived from the freight hauled over its system as a whole would have been affected in part by the nature and extent of its territory, the skill of its management, the efficiency of its equipment and operations, and other contributing factors.

 In the absence of some established standard or accepted formula in the railroad world for evaluating existing traffic control in property as a purchase price factor, the differences existing in individual railroad situations would preclude a substantive capitalization here on the sole basis of the net freight revenues derived by a particular railroad from its general system operations. To the extent that net freight revenues are affected by situational differences, they would seem to be as incompetent individually for computing traffic-control value as would the profits ordinarily of a particular business conducted upon any condemned property to

154

demonstrate general market value. The Missouri Supreme Court has held that individualized profits, based upon variable business factors, do not constitute a competent basis for computing the market value of property in condemnation. Accomac Realty Co. v. City of St. Louis, 347 Mo. 1224, 152 S.W.2d 100. Individual situations may, of course, at times be used in trial proceedings, including witness interrogation, to illustrate, clarify or emphasize the operation of a general principle or standard, after it has been competently established, but they cannot be made to serve as a substantive substitute for the standard itself.

■■■ Much of the attempted capitalization evidence on the part of the condemnee in the present case revolved entirely about the Burlington's individual situation. Thus, one expert witness based his capitalized traffic-control value entirely upon the net revenue which he calculated the Burlington had received from the freight which it derived from the district. In the attempt to emphasize upon the jury's mind the value of the property to the Burlington, he further testified to what percentage the freight from and to the district represented of the Burlington's total freight volume and revenue—facts that could hardly have relevance to the market value of the property, which in no way depended upon the magnitude or profitableness of the Burlington's other operations. Another expert witness also applied the average net freight-haul revenue of the Burlington system in attempting to capitalize the volume of traffic control which he had estimated would accrue to any railroad that owned and operated the switching property. A third expert averaged the net freight-haul revenues of the Burlington and two other railroads, out of the twelve trunk-line systems running into Kansas City, Missouri, for use as a capitalization factor, but without any attempt to establish substantively the competency of this figure as a sound general basis.

■■■ For these improper attempts at capitalization, on figures derived from and applicable only to the Burlington's individual situation, which the trial court received as substantive evidence, the judgment for damages must be reversed and a new trial granted. See National Biscuit Co. v. Nolan, 8 Cir., 138 F. 6.

We shall not undertake to discuss each of the Burlington's other assignments of error. Some of them are controlled by the principles which have been stated above. Others present questions that are not likely to arise on another trial. A few of them, however, merit separate consideration.

The Burlington contends that the court should have instructed the jury that there could be no damage, as a matter of law, to the 11½-foot strips that remained on each side of the property condemned, which contained the private sidings for the industries. It argues that since it would be illegal for it as an interstate carrier to own and maintain the sidings, and since the Development Company was in any event obligated to maintain them under its contracts with the site purchasers, it should be held that these strips constituted separate properties from the lead tracks and turnouts and were therefore not capable of being legally damaged by the condemnation.

Theoretically at least, the lead tracks and sidings might possibly have been sold unitarily to a terminal railroad engaged only in local switching operations for the plants in the district, wholly unconnected with any aspect of line-haul transportation. It is true, of course, that an acquisition solely for such a use would hardly have any interest in the question of traffic control for other transportation purposes, but the question we are now seeking to test is not that of the value of the property here taken for all of its available uses, but whether under any possible theory the side-track strips left could be found to constitute a possibly damageable remainder. Again, it is conceivable that the burden and expense to the condemnee of maintaining the remaining siding strips might be increased by their legal detachment from the lead tracks through condemnation, since the condemnee would no longer be able to transport repairs and replacements over the lead tracks without the payment of proper charges therefor.

■■■ What we have said is, of course, entirely hypothetical and illustrative, and is intended merely to indicate that it cannot be declared here, for the purposes of another trial, that no legal basis can possibly exist for attempting to establish damages to the remaining 11½-foot siding-strips. Since, however, the Development Company's contracts have obligated it to maintain proper side-track facilities for the industrial sites sold, and to provide ways of ingress and egress, and since it appears that the value of the land necessary for

these purposes has been included in the sale consideration for the sites, the Burlington would be entitled to have these facts called to the attention of the jury by proper, tendered instruction, and further to have the jury told that, as a matter of law, these facts would preclude a finding that such part of the 11½-foot strips as would be necessary to enable the Development Company to fulfill its contract obligations had been rendered totally valueless by the condemnation. Within these cautionary bounds, the question would have to be left to the jury to determine, from the weight of the opposing evidence, what the actual damage, if any, to the side-track strips might be.

The mere fact that the Bridge Company or the Development Company may have desired or intended at some future time to unite the industrial tracks into some form of terminal for operation by one of them was not substantively admissible as a damage factor, since the value of the property could not be allowed to be affected by any such conjectural consideration, and the more so because neither corporation had any charter power to engage in such an activity. Compare Kansas & T. Coal Ry. v. Northwestern Coal & Mining Co., 161 Mo. 288, 61 S.W. 684, 692, 693, 51 L.R.A. 936, 84 Am.St.Rep. 717. Similarly, damages could not properly be claimed to a 12-acre tract of land outside the condemnation area, which had been used for farming purposes for the preceding 30 years, on the sole basis of the condemnee's intention to use it as a freight terminal site in connection with any such conjectural operations.

The fact that the Burlington had previously been given access to the district and, as against the public, could be required by the Interstate Commerce Commission and the Missouri Public Service Commission to continue to furnish switching service therefor was simply a circumstance which the jury was entitled to consider, if it believed that it would affect the market value of the property to any general purchaser. Similarly, the fact that another railroad company would have to obtain permission from the Interstate Commerce Commission and the Missouri Public Service Commission to enter the district and to construct the facilities to enable it to do so, and that such Commissions might or might not grant this permission, was equally only a circumstance that the jury might consider, if it believed that the market value of the property to a general pur-

chaser in the railroad world would be affected thereby. Neither of these circumstances could be declared to affect the market value of the property as a matter of law, nor could the Burlington claim to be entitled to occupy some special position in the condemnation by virtue of them. All that the Burlington can legally demand is that it be accorded the same status in acquiring the property as any other general purchaser, and that it not be required to pay any more or any less therefor than would some other railroad.

The parties have engaged in much sharp controversy over whether the Bridge Company or the Development Company should be treated as the owner of the condemned property. The trial judge held that, as between the two corporations, ownership was in the Development Company, notwithstanding the attempt of both of them to contend that the Bridge Company was the real owner. His conclusion, however, rested primarily upon the ground that the Bridge Company's charter had been wholly forfeited and that the corporation therefore was without legal capacity to acquire subsequent title to any property. We have previously indicated that for the purpose of this suit it seems to us unnecessary to pass upon the corporate status of the Bridge Company in relation to the bridge which it claims to have constructed in accordance with its charter obligation. Financing and sale transactions are involved in which third parties are interested, who are not now before the court and who can not properly be brought into this proceeding.

Since the Burlington has made both the Development Company and the Bridge Company parties defendant under section 1504, Mo.R.S.A., on the basis of apparent record ownership,—the Bridge Company having title of record to .30 of an acre of the condemned property—there is no reason why, on the new trial, the determination of the question of market value should not be allowed to proceed in this simple channel. The parties have filed a stipulation, which would appear to be controlling on the new trial also, that the jury may be permitted to return a gross or aggregate verdict as to all parties involved, and this will leave the question of distributive apportionment entirely a matter for the determination of the trial judge. In view of these facts, any confusing controversy over the status and relationship of the Bridge Company and the Development Company would seem to be capable of elimination

156

from the damage trial, or at least to be subject to strict control by the trial court. We need only repeat here that the Bridge Company cannot in any event claim the right before the jury to hold or use any part of the condemned property for railroad purposes. Any further testing of the corporate status of the Bridge Company can be avoided in this proceeding by the filing of a stipulation on the part of the Development Company and the Bridge Company for the apportionment of their shares of the recovery in such manner as they see fit, since that is a matter in which the Burlington can have no possible interest. Any recognition of such a stipulation by the trial judge for apportionment purposes would, however, not necessarily be determinative of the question of ownership or extent of interest for other purposes, such as income tax obligation.

Within the principles which we have discussed, the character and details of the evidence received on the new trial and the nature of the instructions given will have to be left to the discretion of the trial judge. Union Electric Light & Power Co. v. Snyder Estate Co., 8 Cir., 65 F.2d 297, 304; United States v. Becktold, 8 Cir., 129 F.2d 473, 479; Hard & Rand, Inc., v. Biston Coffee Co., 8 Cir., 41 F.2d 625, 627.

#### Conclusion.

The adjudication of the Burlington's right to condemn is affirmed on the grounds and to the extent stated in the opinion. The judgment on damages is reversed and the cause is remanded for a new trial solely upon that issue, subject to the principles which we have discussed.