772

**NORTH KANSAS CITY DEVELOPMENT CO. et al. v. CHICAGO, B. & Q. R. CO. et al.**

**No. 1650.**

District Court, W. D. Missouri, W. D.
April 22, 1944.

Watson, Ess, Groner, Barnett & Whittaker, of Kansas City, Mo., for plaintiff.

Andrew C. Scott, of Chicago, Ill., and Hale Houts and Wm. S. Hogsett, both of Kansas City, Mo., for defendant.

OTIS, District Judge.

The background of this proceeding is this: The C. B. & Q. Railroad Company *sought to condemn and so to acquire certain properties, strips of ground and trackage thereon in North Kansas City (the tracks are used to service various industries) now operated by it under a lease from the owners.* In this court a judgment was entered establishing the right to condemn (which had been disputed) and assessing damages. The judgment, as to the amount of damages only, was reversed by the Circuit Court of Appeals (8 Cir., 134 F.2d 142) and the cause sent back for a new trial on that single issue.

### The Pleadings.

1. As a part of their preparation for the new trial the defendants in the condemnation proceedings brought, as plaintiffs, against the railroad company and one of its vice presidents, as defendants, the present action for discovery. Among other things, the complaint alleges that a factor in the market value of the property condemned is the control of freight haul traffic and of switching charges which ownership of the property gives. Six particular advantages alleged to be incident to ownership are set out. The extent to which these advantages add value to the property, it is alleged, depends on the amount of freight carried in and out over the trackage involved and on the revenues therefrom. So that they may have the facts touching freight and revenue for their bearing on market value and as a basis for expert testimony on market value, plaintiffs pray discovery of the railroad company's books and records.

The essence of the amended answer is: (1) The facts sought by the discovery prayed are not relevant to the matter of market value; (2) the records of the railroad company would not reveal the facts sought except incompletely; (3) discovery would result in unlawful disclosure; (4) the discovery asked would be so burdensome to the railroad company that in judicial discretion it should be denied.

### The Law of the Case

2. Of the issues made by the pleadings the one that stands out is the relevancy vel non of the facts sought by discovery. It is conceded by plaintiffs (the law of the matter is too clear for argument) that what the C. B. & Q. R. Co. has earned from its control of the property under lease is not, as such, relevant to the issues of market value. The theory of plaintiffs is that the facts sought would show—or tend to show—the value to some hypothetical railroad purchaser of the property of the traffic control and the right to collect switching charges incident to its ownership. Plaintiffs rely in part on what they say is the law of the case declared by the Circuit Court of Appeals when the condemnation case was adjudged by that court. Therefore the opinion of that court (8 Cir., 134 F.2d 142) must be studied carefully.

The opinion was written by Judge Johnsen, a very scholarly jurist, one of the outstanding appellate judges, a judge who always writes illuminatingly. It is made perfectly clear in the opinion that it is competent in the condemnation proceeding to consider, as an element affecting the market value of the property, the "traffic control value" to its ownership. "Any general control of existing freight-haul traffic that would result from ownership and operation of the established switching facilities for the district might well constitute a sound factor in its market value as railroad property." 134 F.2d loc. cit. 153.

What is traffic control value? The opinion makes that clear also. The traffic control value to X railroad company, incident to ownership of this property by X railroad company, would be the net revenue, capitalized, which that railroad would receive by reason of ownership above what it would receive without ownership.

It is entirely conceivable that X railroad company might serve a territory so limited as that it could not increase its traffic an iota by reason of ownership of the property. The property then would have no traffic control value to X railroad company. Indeed the traffic control value to any railroad company obviously would be different from the traffic control value to any other railroad company and the value to no railroad company could be measured by the total amount of traffic and the total amount of revenue therefrom received by all railroad companies. There seems to be no "established standard or accepted formula in the railroad world for evaluating existing traffic control in property as a purchase price factor." As the Court of Appeals said: Traffic control value "could only be soundly measured by the volume that with reasonable certainty would proximately follow ownership of the property into the hands of a railroad company generally." And for making that determination there is no standard and no formula.

The law of the case then is this: Traffic control value is a factor proper to be considered in determining market value (the C. B. & Q. Railroad Company had contended otherwise on appeal). But the law of the case does not include any rule for determining what is the traffic control value to *any* railroad or to a railroad *generally* or to some *hypothetical* railroad. The law of the case teaches us *what cannot be done* (the reversal of the judgment was the method employed for impressing that lesson) but it does not teach us what can be done. For that we must look to reason and the evidence.

## No Materiality.

3. Reason does not show us how the traffic control value of the facilities involved can be arrived at from a knowledge of the facts sought here through discovery. We wish to know the traffic control value to X railroad company, the hypothetical railroad, which ownership of this property would give, that is, we wish to know (a) what greater net revenue it would earn by reason of ownership than (b) it would earn without ownership. But we know nothing about X railroad company except that, hypothetically, it owns this property. We cannot learn either (b) or (a) from the data sought by discovery and those factors must be known before the traffic control value to X railroad company can be ascertained. The expert witness who was called by plaintiffs on this point made it clear that the traffic control value would be different as to every particular railroad and also as to X railroad. The data sought would be utterly valueless without other data which cannot possibly be known (e. g., where X railroad runs, what are its connections, what is the character and what the capacity of its personnel).

The same expert witness—his testimony was the rock on which plaintiffs took their stand—could not explain how the data sought, if discovery should be granted, could be used to establish traffic control value "generally" (to use the word employed in the CCA opinion). He knew of no formula. With the same facts, he said, one expert would get one result, another expert a different result. The facts sought, he thought, would *influence* his judgment. But how and why? He could not explain. He could point to no logical or causal connection between the data desired and the solution (the traffic control value to X company of this property) sought. But *we* must see the relevancy of what discovery would reveal. We do not see it although earnestly we have sought some revelation. Here is the fundamental reason for the judgment and decree we shall enter.

### Hypothetical and Actual Railroad.

4. The argument of counsel in which a hypothetical railroad company is supposed has in it a mystic element that baffles us. (So many things baffle us. We would have been baffled, we fear, by the problem of medieaval scholastics: "How many angels can dance on a needle's point?") It is easier to grasp the concept of an actual railroad or actual railroads than to grasp the concept of an hypothetical railroad.

We seek to ascertain the fair market value of the property condemned. It is railroad property, of use only to railroads. It cannot have a market value unless there is a · market (although it might have a value a condemnor must pay). The market for this property must be created by railroad companies which enter the Kansas City territory. A railroad in China or one whose western terminus is St. Louis could not use the property and would not buy the property. Eleven railroads, it is said, enter the Kansas City territory, but, except for three (the C. B. & Q., the Missouri Pacific, the Wabash), the Missouri River comes between them and this property. That barrier limits the possible competitors on the market to three (if the number is not still more limited). Each of the three is a real railroad, not a hypothetical railroad. If we assume that the owner is a willing seller, not compelled to sell and that the three possible competitors are willing, but not compelled to buy, the market price of this property is what it will bring on the market existing by reason of the presence at the auction block of three potential purchasers. But what will it bring? The highest amount offered, that amount which one of the possible purchasers offers and no other overbids. In that situation, in a hearing to ascertain market value, evidence would be competent which would tend to show what values would influence and affect the bids. But the nature of the situation supposed must be kept in mind, that there are three bidders able and willing to buy, three free to act. In that situation what would influence any to bid higher than the others would have a bearing on what is the market value. Logic seems to compel us to say that in such a situation evidence as to the traffic value inherent in the property to any of the bidders (not to a hypothetical bidder) would be competent.

We have been speaking of a situation where market value is in question and there are three possible purchasers, none of whom is set off by law. But the C. B. & Q. Railroad Company is the condemnor. The condemnor is set off by law. Any special value of the property to the condemnor may not be shown. We have a situation then in which the market—on which market value is to be determined—is constituted of two possible purchasers.

The most that either of the two would pay is the market value. What would proximately and naturally influence either of the two in making its bid would be competent evidence. So, it would seem, the traffic value inherent in the property to either bidder could be shown by any competent evidence.

### Handicapped Bidders Considered.

5. But in what we just have said we have assumed that there are two possible railroads free to bid, the Missouri Pacific and the Wabash. Neither, however, is free to bid. The railroad in China and the railroad whose western terminus is St. Louis are not free to bid. The railroads which enter the Kansas City area, but do not cross the river, are not free to bid. They are chained by circumstances to points remote from the market place. They cannot reach the market place on market day. Barriers intervene. But also a barrier intervenes between the Wabash and the Missouri Pacific and the market place. Neither can reach it except by crossing a viaduct of uncertain cost which has not been constructed and by obtaining a permit which may or may not be had.

■ Shall we say then that there is no market for these properties because there is no unhandicapped purchaser other than the condemnor? We cannot say that. The law of the case prevents us saying that. The Circuit Court of Appeals has said (134 F.2d loc. cit. 155) that the obstacles in the way of possible bidders are only circumstances "that the jury might consider, if it believed that the market value of the property to a general purchaser in the railroad world would be affected thereby." (We shall consider hereafter whether the Supreme Court has negatived that declaration.) We cannot say that the properties have no market value because there is no market. Is it permissible then to prove the traffic control value of the properties to, let us say, the Missouri Pacific Railroad Company?

■ We must return again to the definition of traffic control value—the net revenue, capitalized, which a railroad (in this instance the Missouri Pacific) would receive by reason of ownership above what it would receive without ownership. But the difference between what the Missouri Pacific would receive without ownership and what it would receive with ownership would depend largely on the ability and industry of its personnel, the success with which they would utilize the advantages ownership would give them. That is a factor, let us call it X, which cannot be calculated or measured, it can be only guessed at. Moreover, the net revenue the Missouri Pacific would derive from ownership of the facilities—and whether there would be any net revenue—partly would depend on the expense to which it would be put to connect with the facilities. Here is another factor, let us call it Y, which cannot be known certainly. The cost of converting the advantages into additional business also is an uncertain factor, let us call it Z. Having in mind X, Y and Z—and possibly other immeasurable factors which would affect the traffic control value of ownership of the facilities—it is not possible for us to understand how that value to the Missouri Pacific could be determined if all the facts which defendants' books would disclose were known and if also all the facts which the books of all the railroads serving the North Kansas City area were known. Applying an unknown multiplier to a certain multiplicand yields no answer.

So we are impelled to the conclusion that whether we are dealing with a hypothetical railroad or an actual railroad, other than the condemnor, no books of any or all railroads will show the traffic control value of the properties. How they could do so neither plaintiffs' learned counsel nor plaintiffs' witnesses have shown us. To our own importuning the Sphinx makes no answer.

### Powelson Case Distinguished.

6. If we cannot consider handicapped railroads as possible bidders, the declaration of the CCA to the contrary notwithstanding, probably the whole concept of traffic control value to some hypothetical railroad may be cast aside. If no actual railroad can be considered as a possible bidder, it would hardly comport with the practical to imagine some dream railroad and to estimate traffic control value to that wraith. We shall have to be convinced beyond reasonable doubt, however, that the Supreme Court has—as defendants urge—overturned the theory presented by the CCA opinion. We dwell in the very shadow of the appellate court and are accustomed to give more heed to its pronouncements than to "the rumble of a distant drum."

The appellate court opinion was rendered March 2, 1943. United States ex rel.

v. Powelson, 319 U.S. 266, 63 S.Ct. 1047, 87 L.Ed. 1390 (on which defendants rely in this connection), was decided May 17, 1943. The appellate court laid down the rule that such obstacles interfering with possible bidding by other railroads as the necessity of constructing a viaduct (possibly involving exercise of the right of eminent domain) and the necessity of securing a permit to connect with the facilities "could [not] be declared to affect the market value of the property as a matter of law." This declaration was in response to the argument that such other railroads, because of such obstacles, could not be considered as possible bidders in determining the market value. Because of the obstacles, it had been urged, the possibility of bids by such railroads was wholly speculative.

What was ruled in the Powelson case was only this: That the right of eminent domain, not yet exercised, is not property for which compensation must be made when that right is frustrated and therefore that a value, dependent on the exercise of eminent domain, also is not property for which compensation must be made in a condemnation proceeding. The rule would be applicable to the situation here if it was sought to boost the value of the property condemned by adding a value which only would arise if the condemnee should exercise the right of eminent domain (which right this condemnee does not have). We think the rule is wholly inapplicable to take away, for example, from the Missouri Pacific Railroad the character of a possible bidder. The condemnation of the Missouri Pacific's right of eminent domain and of some value bottomed thereon is not involved. Would anyone say that, if the state were condemning a strip of a farmer's land adjacent to a railway for a public highway, the farmer could not show that the railway desired it for additional right-of-way and actually had offered him $10,000 for it, an offer still outstanding. Of course the railway could not take the farm except by eminent domain. But the farmer could sell and the railway buy without the exercise of eminent domain. The Missouri Pacific could buy from the Burlington a right-of-way for a viaduct, if the Burlington would agree (as it would for a sufficient price) and no eminent domain would be needed. The Powelson case does not militate against the doctrine announced by the appellate court.

### Revenue from Switching Charges.

7. The Court of Appeals has said that the property sought to be condemned is to be valued as railroad property. It has said that one element of its value is the traffic control value. Obviously, another element is such net revenue, if any, as would arise from switching charges. (A third element would be the bare-bones value of the physical property.) As we have said we are unable to perceive how the data sought by discovery will reveal the traffic control value of the property or furnish any basis for revelation. (We confess, however, that we are disturbed by the thought that the learned author of the Court of Appeals opinion conceived that there might be some sort of showing of net revenue from traffic control which might be capitalized to establish traffic control value. What sort of showing? Did he mean a showing to which no scientific formula could be applied? Our respect for his views is so great that we leave the subject with no complete conviction of certainty that we are right.)

Now as to switching charges. It is certain that any railroad acquiring these facilities would be entitled to and would make switching charges against other railroads. It is reasonable to believe there would be some profit in these charges, some net revenue above expenses. If one knew the net revenue to any particular railroad from switching charges, that net revenue might be capitalized. Then we would have a factor entering into market value. But the net revenue to any particular railroad, let us say X railroad, from switching charges never could be ascertained from any data the books of C. B. & Q. might disclose. Those books would show the total number of cars the C. B. & Q. switches for other railroads, but not the number X railroad would switch for other railroads. And whether X railroad would have a net revenue from any switching operation would depend in part on the capacity of its personnel, an uncertain quantity.

### Material v. Complete.

8. We do not mean to say that the data sought through discovery is not material because that data alone will not afford answers to the questions: What is the traffic control value to X railroad of this property? What is the net switching revenue ownership of the property would give X railroad? The testimony of a witness may be material although it alone does

not establish a fact. That testimony, supplemented by other material testimony, may establish a fact. Here the difficulty is that, to mean anything, the data sought must be supplemented by other data which cannot be obtained (e.g., the contributions of unknown and unidentified human beings and still other unascertainable facts). Plaintiffs' principal witness said that the data sought would give a "cross-section" from which the character of the whole reasonably might be determined. His figure of speech was not well chosen. He really meant the data would afford him a clue. Sherlock Holmes would ask no more than a clue. In law, however, more must appear to make evidence material.

### Finding of Fact.

1. The data sought through discovery is not material on the issue of damages in the condemnation suit.

### Conclusion of Law.

1. Plaintiffs' prayer for discovery should be denied.

### A Final Word.

The briefs of plaintiffs' learned counsel suggest that without the data sought through discovery plaintiffs will be helpless at the trial to prove their damages. We are not convinced of that. The traffic value inherent in the properties to be condemned is a reality. The Court of Appeals has said so. Perhaps, by the time of the trial, counsel will have found some way to prove a net revenue to a railroad generally which can be capitalized to show traffic control value. That would be a real accomplishment, but it is not a sine qua non of plaintiffs' case. Here is a railroad property. A witness expert in valuing railroad properties may be called to testify. He will qualify. He will testify that this property has a traffic control value. He will describe what traffic control value is, how it comes into being. He will testify what other elements of value are in the property. (Just as when a farm has been condemned for a military

reservation, a witness can describe its soil, its improvements, its proximity to schools, churches, utilities, even its special scenic beauties, and every factor which contributes to its market value.) Having then the definition of fair market value put to him, why can he not give his opinion as to market value? That opinion may consider all the elements of value, including traffic control value and value arising from switching charges. Will his testimony become incompetent because he cannot exactly support a precise valuation of some one element making up market value? (When a farm has been condemned and damages are in issue, is the testimony of the witness incompetent because he cannot show exactly how much value the waterfall adds to the farm, or the cluster of walnut trees, or the value of the special vantage point it offers to observe the sunset?) The witness will be cross examined. He will be able to testify to many relevant facts (e.g., the total number of cars in and out of the district, the territory served by each railroad possibly concerned, the kind—and something of the quantity—of freight shipped in and out, and much other data) which will support his valuation, even although he cannot close his testimony with the ancient formula—Quod erat demonstrandum.

### Judgment and Decree.

This cause coming on to be heard upon the pleadings, the evidence introduced and the argument of counsel, and the Court being fully advised in the premises, and having made a finding of fact and announced a conclusion of law, it is by the Court ordered, adjudged and decreed that (1) plaintiffs' complaint be and the same is dismissed, and (2) the costs of this proceeding are assessed against plaintiffs.

### Addendum.

At the trial certain testimony was offered by defendants and was received tentatively subject to plaintiffs' objections. Those objections now are sustained and the proffered evidence rejected. So ordered.